**BANK OF RIPLEY, Appellant,**

v.

**Gene SADLER, Appellee.**

Supreme Court of Tennessee,
at Jackson.

April 30, 1984.

Robert C. Wilder, Carney & Wilder, Ripley, for appellant.

Robert G. Millar, Shuttleworth, Smith, Millar & Sabbatini, Memphis, for appellee.

## OPINION

FONES, Chief Justice.

The primary issue on this appeal is whether the bank's action in raising the interest rate one-half of one percent on a promissory note at the time it was extended was an alteration that was both material and fraudulent as contemplated in T.C.A. § 47–3–407 and discharged the surety, defendant Sadler. The secondary issue is whether the bank was guilty of unjustifiable impairment of collateral, and if so, to what extent.

Plaintiff bank was awarded a judgment against Sadler for the balance due on a $30,000 promissory note, plus attorney's fees. The Court of Appeals reversed and dismissed the bank's suit, holding that in extending the note, the bank made a material alteration that, regardless of the lack of "evil" intent, operated as a constructive fraud that discharged Sadler's liability on the note. We disagree and reverse the Court of Appeals.

Defendant was the owner of Sadler Construction Company located on premises owned by him on Sadler Street in Ripley, Tennessee. He wanted to sell his construction business to two of his employees, William Perry and Ed Allen, and the three of them sought a $30,000 loan from plaintiff for that purpose. Defendant provided the bank with a current financial statement showing a net worth of $453,250 and it is undisputed that he had had a satisfactory banking relationship with plaintiff for many years. Neither Perry nor Allen had any credit standing or personal collateral to offer the bank and it is undisputed that the bank would not have made the loan but for its desire to accommodate Sadler and his agreement to guarantee the loan.

Sadler represented to the bank that he was giving Perry and Allen six months free rent of his premises where their construction company would be located and operated from and that he would be out there "practically every day" to help them get started. At Sadler's suggestion, the loan agreement struck with the bank was that no payments would be due on the principal or interest during the first six months of the loan, after which time monthly payments would begin in an amount that would liquidate the principal and interest in four and one-half years, a total of five years from the date of the loan. An approximate monthly payment of $650 was mentioned as the sum necessary to liquidate the $30,000 loan in four and one-half years.

The loan was consummated on July 28, 1978, and a promissory note in the principal sum of $30,000 with interest at 9½% due six months later was executed by the partnership Perry and Allen Construction Company, with both partners Perry and Allen signing on the face of the note as makers. The back of the note was endorsed by Perry, Allen and Sadler.

Sadler brought to the bank a list of the personal property, vehicles, and equipment of Sadler Construction Company that he

was selling to Perry and Allen and the bank perfected a security interest in the described property by appropriate filings. It is undisputed that the bank did not view the equipment, have it appraised or even verify from the list delivered to them that the property actually existed.

On October 6, 1978, one of the partners informed the bank that they had sold a 1973 Datsun pick-up for $700, which they tendered to the bank for application on the loan. The bank was asked to release the title to the truck which it did.

On December 23, 1978, one of the partners delivered an insurance draft to the bank to be applied on re-payment of the loan. The bank was apparently informed that the check was in payment of a fire loss involving a 1973 Chevy truck that was part of the collateral securing the loan.

On or about January 29, 1979, the bank was informed that Perry and Allen had sold a GMC dump truck and a Ford backhoe to Don Wray for $7,500, and that sum was tendered for application on the note. The bank considered that the dump truck and backhoe was sufficiently vital to the operation of a construction company that Sadler should approve that sale. Defendant admitted that he was informed and gave his approval. Some additional equipment was also sold at that same time, apparently to Don Wray, for which checks totaling $607 were also delivered to the bank.

Although there was wide disagreement about the effect of the events on the due date of the note, January 29, 1979, there was no significant dispute about what actually occurred. The bank was prepared to honor the loan agreement it made on July 29, 1978, which it interpreted as a commitment to permit Perry and Allen Construction Company to pay off the loan in monthly installments over the ensuing four and one-half year period. On January 29, 1979, the principal balance was $20,792.50 and monthly payments of $457 would amortize the principal and interest in approximately four and one-half years according to the bank officer. The bank proposed that a new note be executed providing for monthly payments in that amount with interest at 10%. Sadler refused, saying only that he "wanted to leave it exactly like it was." The bank officer testified that he understood Mr. Sadler's reason for not executing the new note was that the monthly payments should have been $650 instead of $457. In any event, not being able to obtain a new note, the bank agreed to extend the note one year, at ten percent interest, with monthly payments of $457 beginning March 1, 1979. That agreement was expressed on the back of the note underneath the endorsements of Perry, Allen and Sadler as follows:

> July 29, 1979. $1,425.00 interest paid and note extended to 1/28/80 when I agree to pay the balance of $20,792.50 plus 10% from 1/28/79. We agree to make monthly payments of $457. Begin 3/1/79.
>
> s/ <u>William H. Perry</u>

Monthly payments were made through August or September of 1979. No further payments were made and Perry and Allen left Ripley leaving the collateral on Sadler's premises where it was at time of trial. The bank called upon Sadler to pay the balance of the note and when he refused this suit followed.

## I.

The lower courts disagreed on the issue of whether or not Sadler was an accommodation endorser. In spite of the fact that the bank undoubtedly made the loan to accommodate Sadler and he received $28,000 of the loan proceeds, under the provisions of T.C.A. § 47-3-415, the instrument reflects that he signed for "the purpose of lending his name to another party to it." The official comment makes it clear that a party's obligation is determined by the capacity in which he signs and it is immaterial whether an accommodation party has signed gratuitously or received some benefit or compensation therefor. Thus, the Court of Appeals correctly held that Sadler was an accommodation party.

## II.

The trial court found that defendant's proof was inadequate to sustain the issue raised by defendant that the bank had unjustifiably impaired the collateral. The trial court found that the equipment was located on Sadler's property in Ripley at all times, that Sadler knew that the bank had no interest in the collateral and would turn to him, not the collateral, for payment, in case of default. The Court of Appeals, without discussion of the facts or their application to the legal obligation of the bank in these circumstances, said that while they believed that the evidence preponderated against the chancellor's finding they preferred to base their decision on the alteration issue.

T.C.A. § 47–3–606 provides, in part, that the holder discharges any party to the instrument to the extent that, without such party's consent, the holder "unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse." It is an equitable doctrine designed to protect the surety's right of subrogation. The official comment to T.C.A. § 47–3–606, paragraph five, says that T.C.A. § 47–9–207 should be consulted when a determination is to be made whether or not a holder's actions in dealing with the collateral may be unjustified. However, that section deals only with the action of a holder who has possession of the collateral. Although a number of explicit rights and duties of a secured party in possession of collateral are set forth therein, the standard is that of reasonable care in the custody and preservation of collateral in possession of a holder or secured party. Clearly no higher standard of care would be appropriate for a secured party not in possession.

We think the test of whether a secured party or holder has unjustifiably impaired collateral not in his possession is that of reasonable care under all of the relevant circumstances of the case. The burden of proof is upon the party asserting the impairment of collateral to prove by a preponderance of the evidence that the holder has not used reasonable care under all of the circumstances and to prove the monetary extent to which the collateral has been impaired as a direct result of the failure to use due care, because the discharge of the surety, if impairment is shown, is *pro tanto* only.

The most significant circumstances bearing upon an evaluation of the bank's duty of reasonable care in this case were that possession of the collateral was on premises owned by Sadler and rented to the new purchasers; that Sadler was familiar with and had owned and used all of the equipment in the operation of his own construction company; that Sadler was aware that the identity and value of the collateral was unknown to and of no concern to the bank; that Sadler had represented to the bank that he would be at the premises practically every day and he knew or should have known that the bank would turn to him rather than the collateral in case of default; that in all of these circumstances including Sadler's background as a successful contractor, he knew or should have known that the primary obligation to keep an eye on the collateral would naturally fall upon him.

Defendant contends that the 1973 Datsun pick-up truck was worth more than $700 and that the 1973 Chevy truck that was burned was worth more than $1,875 the insurance company paid for the fire loss. Sadler was the only witness testifying in support of his assertion of impairment of collateral. He was asked his opinion of what the 1973 Datsun pick-up truck was worth when he last owned it in July 1978 and his response was "in the neighborhood, counsellor, of about $3,000, probably." He could not remember when he acquired it but thought he had owned it about "eight or ten months, maybe a year." He said he had added a topper and a tool box and a new set of tires. No proof whatever was offered suggesting that the bank had any knowledge that the truck had any special equipment on it or had any reason to believe that Sadler was not aware

of the sale. Sadler admitted that he contacted the bank about that time and asked them to make a short term loan of $3,000 to Perry and Allen to help the partnership secure some concrete work, affirming that he was in fact in close touch with the purchasers of his business as he had represented he would be. In addition, when asked on cross examination if he did not know in October 1978 that the Datsun pickup truck had been sold, he responded that he did not know the exact month or date, but "I did meet it on the road." No evidence was offered of the value of a normally equipped five-year-old Datsun pick-up truck in October 1978 to support an inference that $700 was such a low price as to impose a duty on the bank to seek Sadler's consent to the sale.

Defendant testified that no one consulted him about the claim against the insurance company for the fire loss of the Chevy truck. When asked if he knew when it burned, he said that he couldn't recall the date but he was on the fire department, answered the call and "it burned by my shop out there and it scared me quite a bit." He did not testify whether or not the truck was a total loss nor give any opinion of what the value of the truck was nor any factual basis whatever for imposing any duty on the bank that it did not fulfill with respect to that item of collateral. If we could find that the bank had a legal obligation to obtain his approval before accepting the insurance company's check tendered to them, which we cannot, it would avail defendant nothing as there is not one scintilla of evidence as to his monetary loss as a result of that alleged impairment of collateral.

Defendant implies that the bank's action in insisting that he approve the sale of the backhoe and dump truck supports his contention that they should have done the same thing with respect to the Datsun pickup truck and the burned truck. To the contrary, we think it affirmative proof confirming that the bank acted with reasonable care in all the circumstances of this case with respect to the collateral.

■■■ Defendant's contention with respect to other items of equipment and tools that he said were missing after Perry and Allen abandoned the business is so lacking in probative value on the issue of impairment of collateral or the monetary extent thereof that further discussion of it is unwarranted. Absent concurrent findings of fact below, review in this Court of findings of fact by the trial court in civil actions is de novo accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise. T.R.A.P. 13(d). We find no credible evidence in this record to support defendant's position on the issue of unjustifiable impairment of collateral and therefore affirm the trial court on that issue.

### III.

■■■ The Court of Appeals correctly held that the terms of the note permitted the extension agreement but that the alteration of the amount of interest raised the question of whether, under the circumstances of this case, it was both a material and a fraudulent alteration as contemplated in T.C.A. § 47–3–407, so as to discharge Sadler. We agree that a finding that an alteration is both material and fraudulent is necessary to discharge a surety, and that the alteration here was material, but disagree that it was fraudulent.

T.C.A. § 47–3–407(2)(a) provides:

(2) As against any person other than a subsequent holder in due course

(a) alteration by the holder which is both fraudulent and material discharges any party whose contract is thereby changed unless that party assents or is precluded from asserting the defense;

. . .

Plaintiff bank is clearly not a "subsequent holder in due course" but rather is the named payee on the note. The "new note" entered into between Perry and bank raised the interest rate from 9½% to 10%. T.C.A. § 47–3–407(1) states that "any alteration of an instrument is material which changes the contract of any party thereto

in any respect, ..." The official comment reads in part as follows:

> Any alteration is material only as it may change the contract of a party to the instrument; and the addition or deletion of words which do not in any way affect the contract of any previous signer is not material. But any change in the contract of a party, however slight, is a material alteration; and the addition of one cent to the amount payable, or an advance of one day in the date of payment, will operate as a discharge if it is fraudulent.

The Code does not define "fraudulent" as used in T.C.A. § 47–3–407. A few cases have attempted to do so. In *Hutcheson v. Herron*, 131 Ill.App.2d 409, 266 N.E.2d 449 (1970), relying on the comments of the Illinois Code Committee the Court held:

> The term "fraudulent" probably requires a finding that the alteration has attempted to impose an obligation or obligations upon the maker or other party against whom enforcement is sought additional to his obligation at the time he signed it. *Id.* at 452.

However, our research indicates that while the *Hutcheson* case seems to support the "constructive fraud" rationale proposed by the Court of Appeals, the majority rule requires actual fraud or dishonesty before there will be a discharge.

In *Thomas v. Osborne*, 13 Wash.App. 371, 536 P.2d 8 (1975), the court stated that:

> "fraudulent" requires a dishonest and deceitful purpose to acquire more than one was entitled to under the note assigned by the maker rather than a misguided purpose.

*See also Gaffin v. Heymann*, 428 A.2d 1066 (R.I.1981); *Bluffestonne v. Abrahams*, 125 Ariz. 42, 607 P.2d 25 (Ariz.App. 1979); *New Britain National Bank v. Baugh*, 31 App.Div.2d 898, 297 N.Y.S.2d 872 (1969).

We hold that under T.C.A. § 47–3–407 the alteration by the holder must involve some type of actual fraud, dishonesty or deceit to support a finding of "fraudulent". Accordingly, as no evidence was presented that the bank's action in raising the interest rate from 9½% to 10% from and after January 29, 1979, was motivated by any evil intent, deceit or dishonesty, we hold that Sadler was not discharged under this statutory provision.

The result is that this note is enforceable against Sadler in accord with its original tenor of interest at 9½%. Plaintiff's complaint only sought 9½% interest. We are unable to determine from the judgment entered in the trial court whether interest to the date of judgment was computed at 9½% or 10%. If pre-judgment interest was computed at 10% then the judgment must be modified accordingly.

The judgment of the Court of Appeals is reversed and this cause is remanded to the Chancery Court of Lauderdale County for the entry and enforcement of a judgment in favor of plaintiff bank in conformity with this opinion. Costs are adjudged against Bank of Ripley.

COOPER, BROCK, HARBISON and DROWOTA, JJ., concur.