John THROWER *v.*
UNION LINCOLN-MERCURY, INC.

84-46                       670 S.W.2d 430

Supreme Court of Arkansas
Opinion delivered June 4, 1984

*Marilyn Rauch* and *Sandra A. De Boer, Central Arkansas Legal Services,* for appellant.

*Thurman, Hockett & Raible,* for appellee.

STEELE HAYS, Justice. This suit for a deficiency judgment by Union Lincoln-Mercury against a defaulting creditor, John Thrower, turns on determining the proper method to compute the surplus or deficiency after foreclosure under Ark. Stat. Ann. § 85-9-501 et seq. Thrower, the appellant, entered into a contract to purchase a 1980 Mercury Marquis from Union, the appellee, which retained a security interest in the automobile. Thrower subsequently defaulted in payments under the contract and returned the collateral to Union. Union gave Thrower "Notice of Repossession and Right to Redeem," and also the proper notice of its intent to dispose of the collateral at private sale. The collateral was sold at private sale to C. P. Schulte, for $9,325. As part of the transaction, Union allowed $2,000 on a 1976 Mercury Schulte offered as a trade-in, which Union resold for $1,200 at wholesale. Union paid $8,927.58 (the amount remaining on Thrower's debt) to Ford Motor Credit

Company, to whom it had guaranteed Thrower's sales contract. Pursuant to § 85-9-504 (1)(b) & (2) Union credited Thrower with the proceeds of the Schulte sale totalling $8,525. (Schulte's down payment of $1,000, $1,200 from the sale of the trade-in, and Schulte's note for the balance, $6,325) and instituted this action against Thrower for the deficiency in the amount of $402.58. Thrower counter-claimed, alleging that there was in actuality a surplus of $479.42 which was owed to him (the difference between the selling price of $9,325 and the loan balance of $8,927.58). The court entered a judgment for Union in the amount of the deficiency.

The appellant argues on appeal that the secured party should not be permitted to deduct from the proceeds of the resale of the 1980 Mercury, as an allowable expense, the difference between the $2,000 allowance for the trade-in and the $1,200 received from the wholesale price. The thrust of appellant's argument is that the $800 over-allowance on the trade-in from Schulte was an expense incurred by Union that was only incidental to doing business, did not result from the default of Thrower, and is not an allowable expense under § 85-9-504 (1)(a)[1]. We find the argument is without merit. The over-allowance, as it is termed, is not a distinctively separate expense as are those suggested in § 85-9-504 (1)(a) or merely incidental to doing business, rather it is an integral part of the bargain and sale of the collateral. The dealer, when selling the repossessed car at what it determines is a marketable price, takes into consideration the buying or bargaining preferences of any individual purchaser in order to make the sale more attractive. The dealer could choose to simply reduce the asking price or grant an over-allowance as was done here. This was in essence the finding of the trial court: ". . . It is the view of the court that the sale of the 1979 [sic] Mercury and the sale of the 1976 Mercury taken in trade should be treated as parts of the

---

[1](1) . . . The proceeds of disposition shall be applied in the following order:

(a) The reasonable expenses of retaking, holding, preparing for sale, selling and the like and, to the extent provided for in the agreement and not prohibited by law, the reasonable attorneys' fees and legal expenses incurred by the secured party.

same transaction; that is, disposing of the collateral. Whatever net proceeds were realized after the completion of the transaction, or $8,525, is the proper basis for computing any surplus or deficiency . . ."

This issue has not been raised frequently under the Uniform Commercial Code and the few cases dealing with it have arrived at the same conclusion as we do here. See *Broome* v. *Rodman Ford Sales, Inc.,* 16 Mass. App. Ct. 183, 456 N.E.2d 469 (1983); *Don Jenkins & Son Ford-Mercury* v. *Catlette,* 59 N.C. App. 482, 297 S.E.2d 409 (1982); *Webster* v. *General Motors Acceptance Corp.,* 267 Or. 304, 516 P.2d 1275 (1973). In *Jenkins,* the court found that the use of an over-allowance was an established trade practice when a trade-in is used as partial payment and noted that § 9-507(2) states that if the secured party has sold the collateral in conformity with reasonable commercial practices among dealers in the type of property sold, he has sold in a commercially reasonable manner. Similarly, there was unrefuted testimony in this case that it is a common trade practice to take trade-ins as part of the sales price and that over-allowance of the trade-in is an accepted trade practice and was necessary in this case to sell the collateral.

The *Broome* opinion *supra,* gives a sound and reasoned summation of the problem. There, the debtor was suing to recover a surplus and the amount the dealer had computed was arrived at by the same method approved by the trial court in this case. The court found the dealer's method correct and said in part:

> . . .[S]urplus due should be computed on the basis of the fair market value (at the time of the sale of the collateral) of any trade-in vehicle together with cash received by [the dealer], rather than the sale price listed on the bill of sale.

> In this case, the trade-in allowance was inflated to induce the sale and the sale price was similarly inflated. Thus, the bill of sale reflected a price higher than the fair market value of the vehicle and higher than the value actually received for the collateral by the creditor.

To compute surplus on the basis of this listed price without a deduction for the trade-in over-allowance would give the debtor a windfall gain in the amount of the over-allowance and cause the creditor to be out-of-pocket this amount.

A determination of surplus or deficiency on the basis of a trade-in allowance instead of market value could be equally unfair to the debtor whose vehicle was repossessed and sold. If upon the sale a trade-in vehicle was accepted and the amount allowed on the trade-in was below market value it could result in a deficiency for which the debtor would be liable under the statute.

Given this method of determining surplus or deficiency, then the primary concern of both debtor and creditor is that the disposition be conducted in a commercially reasonable fashion. § 85-9-504(3) states:

Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms *but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable.* (Our emphasis.)

If there is any concern over the price received for the trade-in or for the collateral, the debtor should challenge that aspect of the sale which he feels has made the disposition commercially unreasonable so as to result in an insufficient price. The creditor's right to deficiency is established by § 85-9-504 (2) and the burden is upon the secured party as the plaintiff to establish the amount to which it is entitled. When the secured party's handling of the disposition is attacked for want of commercial reasonableness, it then has the burden of proving it complied with the provisions of Part Five. *Universal C.I.T.* v. *Rone,* 248 Ark. 665, 453 S.W.2d 37 (1970); *Farmers Equip. Co.* v. *Miller,* 252 Ark. 1092, 482 S.W.2d 805 (1972). When the sale is conducted according to the requirements of the code, the amount received is evidence of the collateral's true value in such an action.

*Universal C.I.T.* v. *Rone, supra.* When the value of the collateral (or trade-in) is at issue, if the secured party has failed to comply with §§ 85-9-501—507, then it has the burden of showing the amount that would have been obtained through a sale according to law. Cf. *Barker* v. *Horn,* 245 Ark. 315, 432 S.W.2d 21 (1968).

This case is one of first impression and in fairness to the debtor, as the issue was not fully developed below, we think it proper to remand the case to determine whether or not the sale of the trade-in was handled in a commercially reasonable manner. The major consideration will be the determination of the fair market value of the trade-in. Factors which have been suggested to establish a fair market value include price handbooks and expert testimony — qualified salesmen, independent appraisers or other dealers. See *Broome, supra; Jenkins, supra;* White & Summers, Uniform Commercial Code § 26-11 (2d ed. 1980). However, there are many elements in any such sale which must be considered to see if the disposition was commercially reasonable and some degree of flexibility must be allowed to assure that unfair practices do not go undetected, or that the creditor is not held to any particularly hard and fast rules[2]. § 85-9-507 (2) states in part: "The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner." Also, whether the collateral is sold wholesale instead of retail is not necessarily determinative of commercial unreasonableness. See *Hemken* v. *First National Bank of Litchfield,* 76 Ill. App. 3d 23, 394 N.E.2d 868 (1979); White & Summers *supra,* § 26-11. Any difference between the fair market value and the price actually received, however, is ordinarily a material consideration, but this fact must be examined in light of all aspects of the sale to determine commercial reasonableness.

The case is remanded for findings not inconsistent with this opinion.

ADKISSON, C.J., and PURTLE, J., dissent.

---

[2]For further discussion on the problems and considerations of this issue, see White & Summers, *supra,* § 26-11.

JOHN I. PURTLE, Justice, dissenting. I disagree with the majority because I think it has unduly complicated the procedure for repossession of chattels. Also it has added trouble, time and expense to the debtor's already existing problems.

Arkansas Stat. Ann. § 85-9-504 (1) (a) (Supp. 1983), a part of the Uniform Commercial Code which has been adopted in Arkansas, allows the expense of retaking, holding, preparing for sale and selling collateral to be deducted from the proceeds of the sale before crediting the balance to the debtor's account. The debtor is then liable for any remaining deficiency.

We have not considered the factual situation before us in any previous opinion. The question before us is whether the difference in the trade-in allowance and wholesale price received by the dealer is a commercially reasonable expense incurred in the repossession and disposition of the collateral. There is no dispute that appellant received the required notice of intended sale of his repossessed vehicle. Neither is there any dispute that he did not receive notice of the proposed sale of the trade-in unit. According to the provisions of Ark. Stat. Ann. § 85-9-504 (3) (Supp. 1983) the sale or disposition of the collateral may be as a unit or in parcels "but every aspect of the disposition including the method, manner, time, place, and terms must be commercially reasonable." *Brown* v. *Ford*, 280 Ark. 261, 658 S.W.2d 355 (1983).

It is common practice for automobile dealers to either discount the list price of a vehicle or make an over-allowance for the buyer's trade-in vehicle. In the case before us the creditor listed the repossesed vehicle at a price higher than the remaining balance of the debtor and also made an over-allowance for a trade-in on the repossessed unit. If the dealer had allowed the new buyer $1,200 trade-in, which he now argues is the real value of the vehicle, the deficiency would have been obvious and a proper charge against the debtor. However, when the contract shows on its face that the repossessed collateral sold for a stated price I think the debtor is entitled to credit in that amount. If creditors were

allowed to make just any allowances for trade-ins it could easily lead to abuse. A dealer or his agent could sell at any price to a relative or friend and the debtor would have to pay the difference. The debtor had the right to rely on the dealer to dispose of his repossessed vehicle in a commercially reasonable manner. An inflated trade-in is not a commercially reasonable sale especially when the debtor is the one who eventually pays the difference. In order to avoid what may seem to be a pitfall a creditor need only make the record speak the facts. This over-allowance is another incident of doing business and is not a part of the cost or expense of retaking and disposing of the collateral. A rule applied to all automobile sales and repossessions alike is not discriminatory. The argument that this rule would disrupt the repossession procedures and cost the debtor in the long run is not logical. I would require the sale transaction disposing of a repossessed item to speak the truth. The procedure mandated by the majority opinion will require a debtor who has already lost his property because he could not pay for it to go deeper into debt by hiring a lawyer or getting stuck for an over-allowance on a trade-in or both.

ADKISSON, C.J., joins in this dissent.