Ray WOMACK v. FIRST STATE BANK OF CALICO ROCK

CA 86-277 728 S.W.2d 194

Court of Appeals of Arkansas
Division I
Opinion delivered April 22, 1987

34

36

*Greg Stephens* of *Hilburn, Bethune, Calhoon, Harper & Pruniski, Ltd.*, and *Gary Vinson*, for appellant.

*Barrett, Wheatley, Smith & Deacon*, for appellee.

MELVIN MAYFIELD, Judge. This is an appeal from a deficiency judgment of $16,384.80 entered against appellant Ray Womack. On January 13, 1984, appellant's son, Coy Womack, obtained a $31,301.00 loan from appellee First State Bank of Calico Rock (Bank). As security for the loan, he pledged a used

1974 Wilson trailer, a used 1973 White truck, a used 1974 Challenger mobile home, and another used 1974 Wilson trailer. Appellant Ray Womack also signed the note. Subsequently, the Bank and Coy agreed to substitute a used 1979 Ford tractor for the last listed Wilson trailer. Coy Womack defaulted on the note, the collateral was repossessed and sold, and suit was filed against both Coy and Ray Womack for the deficiency. When Coy filed for bankruptcy and moved to Texas, the Bank proceeded against Ray Womack.

Appellant first argues that the trial court erred in admitting into evidence a handwritten note purporting to establish that the sale of the collateral was conducted in a commercially reasonable manner. Appellee's only witness was Danny Moser, vice-president of the Bank, who testified to the making of the note, the default, the repossession, the demand for payment, and the notice of sale published in a local newspaper. When Moser attempted to testify about the parties present at the sale, the bids made and the terms of the sale, appellant objected and, on voir dire examination, the witness disclosed that he had not been present at the sale and had learned everything he knew about the sale from the bank president, Davey Wyatt. Appellant's objection to Moser's testimony about what took place at the sale was sustained as inadmissible hearsay. Appellee then introduced two pieces of paper containing the bank logo at the top on which were notations handwritten in ink. Moser identified these as being written by Wyatt, who had been present at the sale, and contended they showed who attended the sale and what prices had been bid for each item. These two memos were admitted, under the business records exception to the hearsay rule, as evidence that the sale was commercially reasonable. Appellant argues that admission of this evidence was error and that without it there was no proof that the sale was conducted in a commercially reasonable manner. We agree with appellant that these notations did not meet the criteria necessary to be admissible under the business records exception to the hearsay rule.

A.R.E. Rule 801 defines hearsay as a statement, other than one made by the declarant while testifying at the trial, offered in evidence to prove the truth of the matter asserted. Rule 802 provides that hearsay is not admissible. Rule 803 sets out numerous exceptions to the hearsay rule where evidence is held

admissible because of its innate reliability. One of these exceptions is known as the "business records exception."

In *Cates* v. *State*, 267 Ark. 726, 589 S.W.2d 598 (Ark. App. 1979), it was explained that under the business records exception seven factors must be present for a record to be admissible. The document must be: (1) a record or other compilation (2) of acts or events (3) made at or near the time the acts occurred (4) by a person with knowledge (or from information transmitted by such a person) (5) kept in the course of a regularly conducted business (6) which has a regular practice of recording such information (7) all as shown by the testimony of the custodian or other qualified witness.

When we apply the facts of the case at bar to these criteria, the memos fail to qualify as a business record for at least two reasons. Even if we accept the Bank's assertion that these notes, jotted down on what appear to be loose pages taken from a memo or scratch pad, were intended by the president of the bank to preserve the terms of a sale of collateral which the Bank would later be required to prove was conducted in a commercially reasonable manner in order to collect a deficiency judgment, there is no evidence in the record to indicate that these notations were made at or near the time the sale took place. Moser simply testified that the notes were written on stationery from one of the bank's note pads and that he recognized the handwriting as Wyatt's. And, in the second place, the record is devoid of any evidence from which we can conclude that Moser was the custodian of the records or otherwise a qualified witness through which these papers could be introduced.

When these notes are excluded, the only evidence that the sale was conducted in a commercially reasonable manner is the notice published in the newspaper and that alone is insufficient to support a proper sale. Therefore, we reverse the award of a deficiency judgment. However, our ruling does not require dismissal. The general rule is to remand common law cases for new trial; it is only when the record affirmatively shows that there can be no recovery on remand that we dismiss. *St. Louis Southwestern Railway Co.* v. *Clemons*, 242 Ark. 707, 415 S.W.2d 332 (1967). Where there is a simple failure of proof, justice would demand that the case be remanded to allow the

appellee an opportunity to supply the defect. *Pennington v. Underwood*, 56 Ark. 53, 19 S.W. 108 (1892). *See also Follett v. Jones*, 252 Ark. 950, 481 S.W.2d 713 (1972); *Colonial Life & Accident Insurance Co. v. Whitley*, 10 Ark. App. 304, 664 S.W.2d 488 (1984).

 Because we are remanding this case, other issues that may arise on retrial will be discussed. First, we examine what constitutes a commercially reasonable sale. Ark. Stat. Ann. § 85-9-504(3) (Supp. 1985) of the Uniform Commercial Code provides:

> Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable.

At this point, we call attention to the recent case of *First State Bank of Morrilton v. Hallett*, 291 Ark. 37, 722 S.W.2d 555 (1987), where the Arkansas Supreme Court held that if collateral is not disposed of according to the Code, the creditor is not entitled to a deficiency judgment. This case should be remembered while considering the rulings in previous cases dealing with this subject.

 Whether a sale was conducted in a commercially reasonable manner is a fact question to be determined from the facts of the particular case under consideration. *Becknell v. Quinn*, 592 F. Supp. 102 (E.D. Ark. 1983). It seems to be generally understood that when the debtor was not given written notice of the time and place of the sale, the sale was not conducted according to the provisions of the Code. *See Hallett, supra; Rhodes v. Oaklawn Bank*, 279 Ark. 51, 648 S.W.2d 470 (1983); *Universal C.I.T. Credit Co. v. Rone*, 248 Ark. 665, 453 S.W.2d 37 (1970); *Barker v. Horn*, 245 Ark. 315, 432 S.W.2d 21 (1968); and *Norton v. National Bank of Commerce*, 240 Ark. 143, 398 S.W.2d 538 (1966).

Other situations in which a sale has been held not to have been commercially reasonable include when the creditor removed

the motor from a repossessed combine and lent it to another customer for several months, thus rendering the combine unsalable for that period of time, *Henry* v. *Trickey*, 9 Ark. App. 47, 653 S.W.2d 138 (1983); when the sale was conducted after a short advertising period, the equipment was complex and the auctioneer was given no technical assistance, and there was a great disparity between the price received and the estimated value of the collateral, *United States* v. *Conrad Publishing Co.*, 589 F.2d 949 (8th Cir. 1978); when there was minimal publicizing of the sale, short notice, no preparation of the collateral, and a large discrepancy between the sale price and the fair market value, *Connex Press, Inc.* v. *International Airmotive, Inc.*, 436 F. Supp. 51 (D.D.C. 1977); *see also Farmers and Merchants Bank* v. *Barnes*, 17 Ark. App. 139, 705 S.W.2d 450 (1986); and when there was an absence of any notice to the public, the sale was conducted at the creditor's office with only the creditor's employees present, and the creditor purchased the collateral, *Benton* v. *General Mobile Homes, Inc.*, 13 Ark. App. 8, 678 S.W.2d 774 (1984).

While a low price is not conclusive proof that a sale has not been commercially reasonable, a large discrepancy between sales price and fair market value "signals a need for close scrutiny" of the sale procedures. *Connex Press, supra*; Ark. Stat. Ann. § 85-9-507(2) (Supp. 1985). In White & Summers, *Uniform Commercial Code*, § 26-11 (2d ed. 1980), the authors suggest that even in cases which cite the failure to give proper notice as the reason for holding that a sale was not commercially reasonable, the true, though unarticulated reason, may be an insufficiency of the sale price. Footnote 117 states:

> Although courts frequently rely on lack of notice, they seldom mention any causal connection between the debtor's injury and his failure to receive notice; there is no suggestion that he would have redeemed or have been otherwise moved to action by receipt of a notice. Hidden among the facts are some interesting data on the resale prices. See, e.g., *Norton* v. *National Bank of Commerce*, 240 Ark. 143, 398 S.W.2d 538, 3 UCC 119 (1966) (car purchased for more than $350 in September resold for $75 in January); *Baber* v. *Williams Ford Co.*, 239 Ark. 1054, 396 S.W.2d 302, 3 UCC 83 (1965) (car purchased in

August for at least $882, including interest but not including downpayment, and resold, apparently in December, for $210); *Braswell* v. *American Nat'l Bank*, 117 Ga. App. 699, 161 S.E.2d 420, 5 UCC 420 (1968) (car purchased for $2,195, excluding interest but including downpayment, and resold, apparently after only a few months, for $850); *Central Budget Corp.* v. *Garrett*, 48 A.D.2d 825, 368 N.Y.S.2d 268, 17 UCC 327 (1975) (car purchased for over $1,600 sold at auction three months later for $300).

The authors conclude that given an unusually low sale price little more is needed for the courts to find the sale commercially unreasonable.

Sale price was recently discussed by the Arkansas Supreme Court in *Thrower* v. *Union Lincoln-Mercury, Inc.*, 282 Ark. 585, 670 S.W.2d 430 (1984).

[Section] 85-9-507(2) states in part: "The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner." Also, whether the collateral is sold wholesale instead of retail is not necessarily determinative of commercial unreasonableness. . . Any difference between the fair market value and the price actually received, however, is ordinarily a material consideration, but this fact must be examined in light of all aspects of the sale to determine commercial reasonableness.

282 Ark. at 590 (citations omitted). *See also, Harper* v. *Wheatley Implement Co., Inc.*, 278 Ark. 27, 643 S.W.2d 537 (1982).

We next discuss the appellant's argument that the trial court erred in refusing to hold that he was discharged from liability because the promissory note sued upon had been materially altered. It was undisputed that after appellant had signed the note the Bank and Coy Womack agreed to delete the last item of collateral, a used 1974 Wilson trailer, and substitute a used 1979 Ford tractor, without appellant's knowledge or consent. It was also undisputed that the Bank discovered when it was repossess-

ing the collateral that this Ford tractor had a prior lien against it for $22,000. Appellant contends that this alteration on the face of the note discharged him. He relies on *Merchants National Bank of Fort Smith* v. *Blass*, 282 Ark. 497, 669 S.W.2d 195 (1984), as support for this contention. In that case, the court stated that, "Arkansas has adopted the well settled principle of law 'that a material alteration in the obligation assumed, made without the assent of the guarantor, discharges him.' " Other cases are relied on by appellant as support for the same proposition.

Appellant continues this argument, in a different vein, by contending he should be released from liability under Ark. Stat. Ann. § 85-3-606(1)(b) (Add. 1961) because, by substituting the encumbered tractor for the unencumbered trailer, the Bank impaired its collateral. That section provides:

> (1) The holder discharges any party to the instrument to the extent that without such party's consent the holder
>
> . . .
>
> (b) unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse.

Appellee responds to these arguments by insisting that appellant was not a guarantor but a comaker and thus jointly liable on the note. It also argues that appellant cannot be discharged from liability unless the alteration of the note was both material and fraudulent. And appellee contends that, in any event, the appellant would be discharged only to the extent of the value of the collateral released by appellee.

As to the guarantor versus comaker issue, we do not agree with appellee's argument that Ark. Stat. Ann. § 85-3-416 (Add. 1961) prevents appellant from being treated as a guarantor in this case. That section of the Uniform Commercial Code does not require that words of guaranty must be used before one can be treated as a guarantor. It only explains the meaning and the effect of certain expressions of guaranty. The "Comment to Uniform Commercial Code," appearing under this section, makes this clear by stating that the purpose of the section is to state "the commercial understanding as to the meaning and effect of words of guaranty added to a signature." The issue in the

instant case is whether the appellant was an accommodation party under section 85-3-415 of the Code. White & Summers, *Uniform Commercial Code*, § 13-12 at 517-18 (2d ed. 1980), states that:

> Under the Code the word "surety" includes all "guarantors" and all "accommodation parties." A "guarantor" differs from an "accommodation party" only because he has added some words to his signature and has so altered (slightly or greatly) the liability he would have had if he had simply put his signature on the instrument as a mine-run accommodation party. Section 3-415(1) defines an accommodation party as "one who signs the instrument in any capacity for the purpose of lending his name to another party to it." Section 3-415(2) tells us that an accommodation party "is liable in the capacity in which he has signed." Thus an accommodation party may appear on the instrument as a maker, acceptor, drawer or indorser and his liability is governed by the Code sections on the contracts of parties who sign in these capacities.

The question of whether one is an accommodation signer was discussed in *Riegler v. Riegler*, 244 Ark. 483, 426 S.W.2d 789 (1968). That case holds that the issue is one of fact and the burden of proof is on the party claiming to be an accommodation signer. *Riegler v. Riegler* was cited by the Supreme Court of Rhode Island in *Kerney v. Kerney*, 386 A.2d 1100, 1102 (R.I. 1978), where that court stated that "the most significant element in determining whether a party to a note is an accommodation party is the intention of the parties: but if no intention is expressed "the purpose of the note becomes the significant element" and where a person "receives no direct benefit from the execution of the paper it is likely that he will be regarded as an accommodation party." *See also Farmers State Bank of Oakley v. Cooper*, 608 P.2d 929 (Kan. 1980), where the court applying the "proceeds" and "purpose" tests found the defendant's status to be one of accommodation since he received no benefits from the proceeds of the instrument and his signature was needed by the maker of the note in order to obtain the loan.

In the instant case, we hold that the question of whether appellant was an accommodation signer is an issue of

fact to be decided on the evidence presented in the retrial of this case. We do not agree with appellant's contention that the doctrine of judicial estoppel is involved here or that the doctrine prevents the guarantor versus comaker issue from being decided in the new trial.

On the issue of appellant's discharge from liability because of alteration of the note, we think the law needs to be put in proper focus in order to reveal the factual issues to be presented to the fact finder. First, we look at Ark. Stat. Ann. § 85-3-407, which deals with the alteration of an instrument. Section (1) of that statute provides that any alteration is material if it changes the contract in any respect, and section (2) provides that against any person other than a subsequent holder in due course, an alteration by the holder that is both material and fraudulent discharges any party whose contract is thereby changed unless that party assents or is precluded from asserting the defense; and section (2)(b) provides "no other alteration discharges any party." Also, Comment (3)(b) to the statute states that a material alteration does not discharge any party unless it is made for a fraudulent purpose. Moreover, in the *Merchants National Bank of Fort Smith* v. *Blass* case, *supra*, the court said:

> We agree with the Appellant that the alterations on the face of the note in question, when taken alone, did not discharge Appellee from liability. Ark. Stat. Ann. § 85-3-407(2)(a) (Add. 1961), expressly provides that to discharge a party to the contract an alteration must be both fraudulent and material. Here, there is no evidence of fraud.

282 Ark. at 499. *See also, Bank of Ripley* v. *Sadler*, 671 S.W.2d 454, 458 (Tenn. 1984) ("We agree that a finding that an alteration is both material and fraudulent is necessary to discharge a surety . . .").

Of course, we do not know what evidence will be presented in the retrial of this case but even if there is no evidence of a fraudulent alteration, the question of appellant's discharge is not completely answered. We must now look at Ark. Stat. Ann. § 85-3-606 (Add. 1961). White & Summers, *Uniform Commercial Code*, § 13-14 at 524-25 (2d ed. 1980), discusses this section as follows:

Section 3-606(1)(a) specifies changes in the legal relationship between debtor and creditor that discharge the surety. When, without the surety's consent the holder "releases or agrees not to sue . . . or agrees to suspend the right to enforce . . . the instrument or collateral or otherwise discharges" the principal debtor, the surety is discharged . . .

. . .

Under section 3-606(1)(b) the surety is also discharged when, without his consent, the creditor "unjustifiably impairs any collateral for the instrument."

The case of *Bank of Ripley* v. *Sadler*, 671 S.W.2d 454 (Tenn. 1984), which we have previously cited, is also applicable on this point. In that case, the appellee, Sadler, endorsed a note made to a bank by two of his employees who were buying his construction business. The employees defaulted on the note and the bank sued Sadler for the balance due. It was held that Sadler was an accommodation party to the note and that he was not discharged under the provisions of section 3-407 of the Commercial Code because there was no fraudulent alteration of the note by the bank. The court then considered section 3-606 of the Code. The bank had granted the employees an extension of the note and had raised the interest rate from 9½% to 10%. Although Sadler contended that he had not agreed to this action by the bank, the court held that "the terms of the note permitted the extension agreement." 671 S.W.2d at 458. The court found that the increase in interest rate was not fraudulent under section 3-407 of the Code but did not discuss section 3-606 as to this point. However, it is plain that this increase in interest rate did not violate section 3-606(1)(a) as it did not release the makers of the note or suspend the right to enforce the note. The court did, however, discuss section 3-606(1)(b) which provides for the discharge of a party to the note "to the extent" that without such party's consent the holder unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse.

The impairment issue mainly involved the bank's release of the title to a pickup truck, so that it could be sold by makers of the note, plus a check from an insurance company

received by the makers for the fire loss of another vehicle. These vehicles were part of the collateral securing the note to the bank. The proceeds of the sale and the check were given to the bank for application on the note. Sadler argued that this "unjustifiably" impaired the collateral for the note as it affected the assets of the business and his right of subrogation against the collateral. The court made two findings that have special significance in the instant case. One, it was held that the test of whether a secured party has unjustifiably impaired collateral not in his possession is "that of reasonable care under all the relevant circumstances of the case." Two, it was held that if impairment does occur the discharge of the surety is *pro tanto* only. This last holding is in keeping with section 3-606 which provides that a party's discharge is "to the extent" that the collateral is unjustifiably impaired. This was also the view taken by the court in *Farmers State Bank of Oakley* v. *Cooper*, 608 P.2d 929 (Kan. 1980), and *Sadler* and *Cooper* also hold that the burden of proving the monetary extent to which the collateral has been impaired is upon the party claiming the impairment. Our own case of *Van Balen* v. *Peoples Bank & Trust Co.*, 3 Ark. App. 243, 626 S.W.2d 205 (1981), also held that the amount of the impairment of the collateral is the limit of the right to be discharged. And we also said that section 3-606 of the Code, Ark. Stat. Ann. § 85-3-606 (Add. 1961), places the burden of proving the collateral was unjustifiably impaired and the extent thereof upon the party who seeks a discharge of all or part of his obligation.

We pause here to note that *Van Balen* discussed a point that appears sure to arise in another trial of the instant case. The opinion refers to a case where impairment of the collateral (failure to perfect a lien on pledged corporate stock) did not effect a discharge upon a guarantor because it was shown that the stock had no value. This is significant in the present case both on the question of extent of the impairment and its *pro tanto* discharge, and as to the reasonableness of the Bank's action, under all the circumstances, in substituting the Ford tractor for the Wilson trailer as collateral on the note in this case.

We also point out that we have carefully considered the cases of *National Bank of Eastern Arkansas* v. *Collins*, 236 Ark. 822, 370 S.W.2d 91 (1963); *Spears* v. *El Dorado Foundry, Machine & Supply Company*, 242 Ark. 590, 414 S.W.2d 622 (1967); and

*Moore* v. *First National Bank of Hot Springs*, 3 Ark. App. 146, 623 S.W.2d 530 (1981). These cases, and others like them, are relied upon by the appellant for their holdings that a guarantor, or surety, is a favorite of the law and his liability is not to be extended beyond the express terms of his agreement and that a material alteration of the obligation, without his assent, will discharge him. None of those cases, however, involved the obligation of a guarantor or surety as fixed by the Uniform Commercial Code. The agreements in those cases were guaranty agreements made by the parties outside of and not governed by the provisions of the Commercial Code. Moreover, the alterations of the obligations guaranteed were such that entirely new obligations were created and, under those circumstances, the guarantors or sureties were fully discharged. Even under the Code, this result can be possible in a proper case. *See Langeveld* v. *L.R.Z.H. Corporation*, 376 A.2d 931 (N.J. 1977), where the court read the Code as providing for release of a surety, where the collateral has been unjustifiably impaired, to the extent that the impairment "can be measured in monetary terms." However, the court said:

> The effect of the impairment upon one secondarily liable may or may not be translatable into dollars. There may be clear prejudice without precisely calculable loss. This will normally result in the discharge of the surety.

376 A.2d at 937.

Finally, appellant argues the trial court erred in not setting aside the judgment after it was learned that another attorney from the firm which represented the Bank at trial (different attorneys represent the Bank in this appeal) had represented Coy Womack when repossession of the collateral first began. The appellant, Coy's father, only discovered this previous relationship some two months after the entering of the judgment against him. He then filed a motion to have the judgment set aside for this reason. The motion was denied. Appellant contends Rules 1.7 and 1.9 of the Model Rules of Professional Conduct, *see* 287 Ark. 499, 702 S.W.2d 326 (1985), prohibit counsel from representing a client when he may have a conflict of interest and cites numerous cases stating this rule. He asserts that because an attorney made a few phone calls on behalf of Coy Womack when the Bank first began repossessing the collateral, the attorney's

firm should have declined subsequent representation of the Bank in the deficiency action. Appellant directs us to no cases, and we have found none, in which a conflict of interest by counsel was held to be grounds for setting aside a judgment.

Rule 1.7 provides that a lawyer shall not represent a client if the representation will be directly adverse to another client unless he reasonably believes the representation will not adversely affect the relationship with the other client. The appellee submits that this rule has not been violated as its trial counsel never represented appellant and the representation of Coy Womack ceased long before trial counsel accepted representation of the Bank in this case.

Rule 1.9 prohibits a lawyer of a former client from subsequently representing another person in the same or substantially related matters. Appellee contends this rule has not been violated because it was not in effect at the time of this trial and that the introduction to the rules states their purpose will be subverted if they are invoked by opposing parties as procedural weapons. Under the circumstances, we cannot say that the trial court's refusal to set aside the judgment in this case was erroneous. Since the attorneys who represented appellee at the trial have now been permitted to withdraw, this issue should not arise in the retrial of this case.

Because of the error in admitting into evidence the written notes alleged to have been made by the president of the appellee Bank at the time of the sale of the collateral, the judgment is reversed and the case remanded for a new trial. We have attempted to fully discuss the law with respect to the issues which we think may arise in a new trial. We remand for a new trial consistent with the law set out in this opinion.

Reversed and remanded.

CRACRAFT, J., agrees.

JENNINGS, J., concurs.