Cary S. POLLACK and Robin Craft *v.* PULASKI BANK & TRUST COMPANY

CA 89-255                                    781 S.W.2d 497

Court of Appeals of Arkansas
Division I
Opinion delivered December 20, 1989

22

*Smith Law Firm, Ltd.*, by: *Floyd A. Healy*, for appellant.

*C.B. Blackard III*, for appellee.

JAMES R. COOPER, Judge. On July 15, 1987, the appellants executed a promissory note to the appellee in the original principal amount of $62,180.12, giving a security interest in equipment used in the appellants' business, The Image Factory, Inc. The security agreement required the appellee to give five days' written notice before sale of the collateral in the event of default and repossession. In October 1987, the note was in default, and the appellants voluntarily surrendered possession of the equipment to the appellee. The parties kept in close contact with each other, and both attempted to secure a purchaser of the equipment. In February 1988, the appellee accepted an offer in the amount of $50,000.00 from Filmed Events Network. Although the appellee contacted the appellant Robin Craft and obtained her consent to the sale, the appellant Cary Pollack was not contacted, and no written notice was sent to either of the appellants. The appellee subsequently sued the appellants for the deficiency. After a bench trial on February 6, 1989, the trial court found that the sale of the collateral had been conducted in a commercially reasonable manner and entered judgment for the appellee in the amount of $14,871.48, plus costs. From that decision, comes this appeal.

For reversal, the appellants contend that the trial court erred in finding that the sale of the collateral was conducted in a commercially reasonable manner and that, because the conduct of the sale was commercially unreasonable, the appellee was not entitled to a deficiency judgment. We affirm in part and reverse in part.

The parties' security agreement provided that:

If any of the Collateral is perishable or threatens to

decline speedily in value or is of a type customarily sold on a recognized market, no notice of sale or other disposition shall be given by Bank to Borrower. Otherwise Bank will give Borrower prior written notice of the time and place of any public sale or of the date after which any private sale or other intended disposition is to be made, by mailing such notice postage prepaid by Certified or Registered Mail, to the address of Borrower shown at the beginning of this Agreement at least five (5) days before the day of the sale or disposition.

At trial, Jean Blackwood, vice president and commercial loan officer for Pulaski Bank, testified that, on February 1, 1988, Phillip Moore, with Filmed Events Network, contacted her about the collateral. Ms. Blackwood stated that he looked at the equipment, called her back the next day, and made an offer of $45,000.00. Ms. Blackwood refused this offer, and Mr. Moore made another offer of $50,000.00. She testified that she informed him that she would have to wait until the next day to give him an answer and that she immediately called Ms. Craft to inform her about the $50,000.00 offer; Ms. Craft told her that the appellant, Mr. Pollack, was out of town and that there was no way to reach him but that he would be calling Ms. Craft later. She testified that Ms. Craft told her that she (Ms. Craft) was trying to get in touch with another potential purchaser. Ms. Blackwood stated that she called Ms. Craft the next morning to see if Ms. Craft had been able to contact anyone, and was informed that Ms. Craft had not been able to do so. Ms. Blackwood stated that Ms. Craft told her, if she (Ms. Blackwood) had not heard from her within an hour, to go ahead and accept the offer. Ms. Blackwood testified that she waited two hours and then called Ms. Craft back; at that time, Ms. Craft told her to go ahead and sell the equipment to Filmed Events Network. Ms. Blackwood testified that, immediately thereafter, Mr. Moore called her; she accepted his offer and told him the papers would be ready the next day. Ms. Blackwood stated that, later that same afternoon, Ms. Craft called and told her that someone else was willing to purchase the equipment for as much as $70,000.00. Ms. Blackwood stated that she told Ms. Craft that she did not believe the appellee could break its oral agreement with Filmed Events Network, and that Ms. Blackwood met the next morning with the president of the bank, the

bank's attorney, and another vice president of the appellee. Ms. Blackwood testified, "[i]t was decided that, although the other offer was more and would pay us off, that we could not go back on our word. I mean, we had said we would do something, and we were liable for that." Ms. Blackwood admitted that the gentleman that had contacted Ms. Craft also called her at the bank. Ms. Blackwood also admitted that the offer from Filmed Events Network was simply an oral offer and that the appellants were not given written notice of the sale.

Ms. Craft testified that Ms. Blackwood had called her and said that she had an offer that was good for twenty-four hours for $50,000.00 from Filmed Events Network. She stated that Charles Friedman contacted her on the same day that Ms. Blackwood had told her about the other offer. Ms. Craft testified as follows:

> Q.    Was there ever a monetary figure discussed as to how much Mr. Freidman would purchase the collateral for?
>
> A.    Yes, there was. I told him that I had just talked to Jean a few hours before and there had been — an offer had been made for $50,000, which she was going to accept or had accepted. And I didn't know at that point, but he told me then — he said, "I can go as high as 70, if that makes any difference. If you can get them to talk to me, I could go as high as 70,000." I told him that the balance owed on the equipment was 63 and that he could get it for 63, around in there, because we weren't interested in making a profit on the system. We just wanted the bank paid off.
>
> Q.    Do you have personal knowledge whether or not Mr. Freidman called the bank and communicated his offer to them?
>
> A.    I talked to him two or three times that day. He called back at one point that afternoon and said he had contacted the bank himself, and he had spoken to a man in the loan department — he didn't know who it was that he talked to — and the person told him she knows that this equipment has already been sold and that, "We wouldn't even discuss it. It's a done deal," more or less.

Mr. Pollack testified that the appellee had represented to

him that he would be involved in the sale or disposition of the collateral and would have an opportunity to discuss offers because he had the most knowledge about the value of the equipment.

Charles Friedman testified that he communicated his willingness to pay up to $70,000.00 for the equipment to the appellee and was informed that the appellee had a verbal commitment with another company and would not deal with him.

At the conclusion of trial, the circuit judge stated:

> I think the provision for the notification does not cover the situation when they are in constant contact with the debtor as they were here. That is the intent to let them know what is going on. Make sure the debtor knows what you're doing. They're in almost daily contact with the debtor and conferring about what is going on about the sale. It's kind of silly to say, "We are letting you know what is going on. We are sending a five-day day notice," especially when the offer is in hand, as you told me here today.

The circuit court entered judgment for the appellee and stated:

3. In February 1988, the [appellee] received an oral offer to purchase the collateral for $50,000.00. Prior to accepting the offer, the [appellee's] officer, Jean Blackwood, telephoned the [appellant], Robin Craft (wife of the [appellant], Cary Pollack), and informed her of the offer. The parties concurred that the offer was the highest they had received so far and should be accepted.

4. After the [appellee] accepted the offer, the [appellants] were contacted by one Charles Israel Freedman [sic] who claimed he would be willing to purchase the collateral for more than $50,000.00. Having already accepted the previous offer of $50,000.00, the [appellee] was unable to sell the collateral to Mr. Freedman [sic].

5. All aspects of the sale of the collateral were commercially reasonable as required by Arkansas Code Annotated section 4-9-504. The provision contained within

the security agreement requiring the mailing of written notice five days before the sale did not apply due to the constant communication between the parties regarding the sale of the collateral.

On appeal, the appellants argue that, since no written notice of the sale was provided, the appellee did not conduct the sale of the collateral in a commercially reasonable manner as provided in Ark. Code Ann. Section 4-9-504(3) (1987). They rely on *McIlroy Bank & Trust* v. *Seven Day Builders of Arkansas, Inc.,* 1 Ark. App. 121, 613 S.W.2d 837 (1981), for their assertion that the appellee was required to give them written notice of the sale, and further, they argue that the security agreement itself provided that they were to receive at least five days' written notice of the sale. The appellee correctly argues that *McIlroy Bank & Trust* dealt with Ark. Code Ann. Section 4-9-505 (former Ark. Stat. Ann. Section 85-9-505 (Supp. 1979)) and does not apply here. The appellee contends that the language of Ark. Code Ann. Section 4-9-504(3) does not require the secured party to send written notice to the debtors and does not proscribe notification by telephone. They also argue that, even if written notice was required, the appellants waived that right by their post-default conduct, i.e., their close contact with the bank in their efforts to secure a purchaser and Ms. Craft's statement to Ms. Blackwood to go ahead and accept Filmed Events Network's offer.

Arkansas Code Annotated Section 4-9-504(3) (1987) provides in pertinent part:

Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, if he had not signed after default a statement renouncing or modifying his right to notification of sale.

*See also Anglin* v. *Chrysler Credit Corp.*, 27 Ark. App. 173, 175, 768 S.W.2d 44, 45 (1989). In the case at bar, there was no evidence that the appellants signed after default a statement renouncing or modifying their right to notification of sale.

■ In their treatise, *Uniform Commercial Code*, James White and Robert Summers note that:

> For a private sale of collateral that is neither perishable nor threatens to decline speedily in value, nor is customarily sold on a recognized market, the creditor must inform the debtor of "the time after which any private sale or other intended disposition is to be made * * *." For such public sales, 9-504 requires different information: "the time and place of any public sale * * *."

J. White & R. Summers, *Uniform Commercial Code* Section 27-12, at 600 (3d ed. 1988). The distinction between private sale and public sale was recognized by the Arkansas Supreme Court in *Barker* v. *Horn*, 245 Ark. 315, 316, 432 S.W.2d 21, 22 (1968), where the Court stated that, although the statute requires notice of the time and place of public sale, only reasonable notification of the time after which a private sale will be made is required. In *Womack* v. *First State Bank of Calico Rock*, 21 Ark. App. 33, 728 S.W.2d 194 (1987), we stated, "[i]t seems to be generally understood that when the debtor was not given written notice of the time and place of the sale, the sale was not conducted according to the provisions of the Code." 21 Ark. App. at 39, 728 S.W.2d at 197.

In *Barker* v. *Horn*, 245 Ark. 315, 432 S.W.2d 21 (1968), the Court held that reasonable notice was not provided where oral notice of sale was given without any specification as to the time of sale. The Court did not specifically approve of oral notice and stated:

> Thus, there was no evidence upon which to base any finding that notice was given. There is no contention that such notice was not required in this case. The statute requires notice of the time and place of public sale. While only reasonable notification of the time after which a private sale will be made is required, appellee's oral notice was of a sale to the highest bidder without specification of any time. For this reason, it cannot be said to constitute reasonable notice.

245 Ark. at 316, 432 S.W.2d at 22.

■ We believe that Section 4-9-504(3) implies that written

notice must be sent to the debtor and specifically requires a writing, signed by the debtor after default, before the debtor's right to such notice may be modified or renounced. It is apparent that the circuit judge considered that the appellants were estopped from relying on the defense of lack of written notice because Ms. Craft was informed of the proposed sale of the collateral and agreed that Mr. Moore's offer should be accepted. The situation is similar to that presented in *Wheeless v. Eudora Bank*, 256 Ark. 644, 509 S.W.2d 532 (1974), where the creditor maintained that the appellant debtor had acquiesced in a repossession and subsequent sale of an automobile; the debtor, however, testified that no one had discussed the sale with him at any time and that he had not consented to the procedure. The bank's officer testified that he had informed the debtor in advance that the bank was going to repossess the automobile and sell it but admitted that he had mentioned no specific date. The Court reversed, holding that the trial court erred in ruling that the appellant debtor was estopped to assert lack of notice as a defense and stated:

> Appellee admits it did not comply with the notice requirement but asserts that appellant had prior knowledge of the sale which constituted a waiver of his right to notice and that, having such knowledge, he was estopped to claim lack of notice as a defense. The testimony of appellee's vice president, Arnold, was in direct conflict with that of appellant as to whether appellant was told of the sale, and signed over the title before or after the sale occurred. Appellee also contends this was a private sale and appellant's statement that he knew the car had been repossessed and his surrender of the keys to employees of Eudora Motor Company amounted to an admission he had notice that after that time the car was subject to private sale. The notice provision of Ark. Stat. Ann. Section 85-9-504 requires more than this. Knowledge of repossession does not equate with notice of sale, nor does knowledge that an automobile will eventually be sold. The debtor is entitled to notification of a specific date after which the creditor intends to dispose of the property. This would provide the debtor a fixed period within which to protect himself from an inadequate sale price in any manner he

saw fit. *Nelson* v. *Monarch Investment Plan of Henderson, Inc.*, 452 S.W.2d 375, 7 UCC Rep. Serv. 394 (Ky. March 27, 1970). Therefore, the determination of whether appellant had prior knowledge of the sale and whether that knowledge would estop him from asserting lack of notice as a defense must be made on the basis of the conflicting testimony of appellant and Arnold.

We are committed to the doctrine that, since estoppel bars the truth to the contrary, the party asserting it must prove it strictly, there must be certainty to every intent, the facts constituting it must not be taken by argument or inference and nothing can be supplied by intendment. *Ford Motor Credit Co.* v. *Exchange Bank*, 251 Ark. 881, 476 S.W.2d 208; *McFaddin* v. *Bell*, 168 Ark. 826, 272 S.W. 62. The evidence supporting the claim of estoppel in this case is certainly not free from argument. The trial court erred in ruling that appellant was estopped to assert lack of notice as a defense.

256 Ark. at 648, 509 S.W.2d at 534-35.

In the case at bar, we agree with the trial judge that Ms. Craft is estopped to assert lack of written notice as a defense. Estoppel is a doctrine which involves both, not just one, of the parties; the party claiming estoppel must prove he relied in good faith on some act or failure to act by the other party and that, in reliance on that act, he changed his position to his detriment. *Worth* v. *Civil Serv. Comm'n*, 294 Ark. 643, 646, 746 S.W.2d 364, 366 (1988). The evidence shows that Ms. Craft was fully apprised of Filmed Events Network's offer, that she told Ms. Blackwood to accept it, and that, in reliance on her statement to accept the offer, appellee did so. The trial judge did not err in finding that the requirement of written notice did not apply to Ms. Craft.

However, the strict proof necessary to show estoppel is lacking with respect to Mr. Pollack. Spouses are not agents for one another merely by virtue of the marital relationship, *see Langston* v. *Langston*, 3 Ark. App. 286, 625 S.W.2d 554 (1981), and the appellee clearly failed to prove that Ms. Craft had the authority to renounce Mr. Pollack's right to written notice in his absence. Under these circumstances, we do not think that the

appellee could reasonably rely on Ms. Craft's actions insofar as Mr. Pollack's rights are concerned, and we hold that the circuit judge erred in finding that the security agreement's requirement of written notice before sale did not apply to Mr. Pollack.

Whether a sale of collateral was conducted in a commercially reasonable manner is essentially a question of fact. *Farmers and Merchants Bank* v. *Barnes*, 17 Ark. App. 139, 705 S.W.2d 450 (1986). Because the evidence supports a finding that Ms. Craft was estopped to assert lack of written notice of sale as a defense, we hold that the circuit judge's finding that the sale of the collateral was conducted in a commercially reasonable manner is not clearly against the preponderance of the evidence with respect to Ms. Craft. However, because there is no evidence to show that Mr. Pollack was bound by Ms. Craft's actions or was otherwise estopped to assert lack of notice, we hold that the trial court erred in finding the sale to be commercially reasonable with respect to Mr. Pollack in the absence of written notice of sale.

The appellants next argue that, because the sale of the collateral was not conducted in a commercially reasonable manner, the trial court erred in entering a deficiency judgment. We need not address this issue with respect to Ms. Craft, because we have held that the sale was conducted in a commercially reasonable manner insofar as her rights are concerned. However, it is clear, in light of *First State Bank of Morrilton* v. *Hallett*, 291 Ark. 37, 722 S.W.2d 555 (1987), that the appellee is not entitled to a deficiency judgment against Mr. Pollack. In *First State Bank of Morrilton*, 291 Ark. at 41-42, 722 S.W.2d at 556-57, the Court ruled that, when a creditor repossesses collateral and sells it without sending proper notice to the debtor as required by the Uniform Commercial Code, the creditor is not entitled to a deficiency judgment. "When the code provisions have delineated the guidelines and procedures governing statutorily created liability, then those requirements must be consistently adhered to when that liability is determined." *First State Bank of Morrilton*, 291 Ark. at 41, 722 S.W.2d at 557. "If the secured creditor wishes a deficiency judgment he must obey the law. If he does not obey the law, he may not have his deficiency judgment." *First State Bank of Morrilton*, 291 Ark. at 41, 722 S.W.2d at 557, quoting *Atlas Thrift Co.* v. *Horan*, 27 Cal. App. 3d 999, 104 Cal. Rptr. 315, 321 (1972).

Affirmed in part; reversed in part.

JENNINGS and MAYFIELD, JJ., agree.