Dunkin, Ch.
delivered the opinion of the Court.
The zeal with which this appeal has been urged, and the importance of the question involved, may render it proper to elucidate, by some further observations, the principles propounded by the decree.
A Court of Chancery was first established in South Carolina in 1721. By the tenth section of the Act it is provided “that the said Court shall proceed, adjudge and determine in all causes brought into the said Court, as near as may be, according to the known laws, customs, statutes and usages of the Kingdom of Great Britain, and also, as near as may be, according to the known and established rules of his Majesty’s High Court of Chancery in South Britain.” ’ By the first section of the Act of 1791, it is declared that the laws, then of force, for establishing and regulating the Court of Chancery within this State, shall be and continue of force in this State, until altered or repealed by the legislature thereof, subject, nevertheless, to such alterations, amendments and restrictions as are thereinafter directed.
It would seem, then, only necessary to inquire whether, by the known usages and practice of the Court of Chancery in England, or by force of any special statute of South Carolina, the Court of Equity has jurisdiction of this cause. In England it is well settled that the cognizance of matrimonial causes belongs exclusively to the Ecclesiastical Courts. For a short time, during the Protectorate of Cromwell, when the spiritual courts were closed and the civil law was silenced, the Court of Chancery took cognizance of cases of alimony, but on the re-establishment of the Courts Christian, after the restoration, a demurrer to a bill of alimony was sustained.— Such had been the usage of Westminster Hall in 1721. No Court of Chancery in England, no judge of a Chancery Court, has ever, at any time, in the most disturbed condition of civil society, undertaken to pronounce a marriage null and void, or to take cognizance of such matter. Nearly a quarter of a century ago the Supreme Court of this State, in Rhame v. Rhame, advert to the practice of the English Court of Chancery, as well as to that of South Carolina, in relation to matrimonial causes, and it is there declared that the case of alimony has *392 always been regarded as an exception, and that “the jurisdiction of the Court must be limited to the allowing of alimony.” This would seem to be the natural end of the investigation, as well as a satisfactory answer to the argument from necessity. If, twenty years since, it was judicially announced that the Court of Equity has no cognizance of matrimonial causes beyond the allowance of alimony, and a necessity existed for more extensive authority, legislative interference would have supplied the defect, and, iollowing the example of other States, would have vested the judicial tribunals of the country with this new and perilous power. The silence of the Legislature is conclusive — -regarding the sacred nature of the marriage contract as a matter of public interest, they will neither interfere with it themselves, nor delegate to othei s the power to dissolve it. The distinction between the authority to declare a marriage null and void, or to grant a divorce, has no sanction either in reason or authority. The same general principle which would authorize Courts of Equity to declare a contract void for want of consent, would require them to interfere in cases of fraud or misrepresentation, and declare the contract no longer obligatory on one party when the other had refused to perform the duties imposed by it. But no Court, either in England or in the United States, has ever declared a marriage null and void in its inception which did not, at the same time, assume, as a necessary incident, the authority to divorce the parties, in England a mensa et thoro, in our sister States a vinculo. Wightman v. Wightman, 4 J. C. R. 343, is the only decision brought to the notice of the Court in which is affirmed the inherent authority of Chancery to declare a marriage null and void in a suit between the parties themselves. Ferlat v. Gojon, 1 Hop. R. C. R. 487, rests on Wightman v. Wightman. Able decisions from North Carolina were cited, but in those cases, the jurisdiction of the Court is expressly based on special Acts of the Legislature. In Wightman v. Wightman, the language is plain and unequivocal. “ All matrimonial, and other causes of ecclesiastical cognizance,” says the Chancellor, “ belonged originally to the temporal courts; and when the spiritual courts cease, the cognizance of such causes would seem, as of course, to revert back to the lay tribunals.” After adverting to the statutes of New York, the Chancellor proceeds, “Divorces a vinculo, says Lord Coke, are causa metus, causa impotentice, causa ajinitatis, causa consanguinitatis, &c. These cases, and that of lunacy, are not within the statute giving to this Court jurisdiction concerning divorces.” He then proceeds to affirm, and to shew, in his own words, that the Court of Equity “iscom *393 petent, not merely collaterally, but by a suit instituted directly, and for the sole purpose, to pronounce a divorce in such cases.” 'This is distinct and intelligible, and the process of reasoning (assuming the truth of the premises) sufficiently strong in reference to the judicial system of New York. Chancellor Kent •does not place the jurisdiction of the Court on its ordinary authority in reference to ordinary contracts, but he boldly assumes the position that the Court of Chancery in New York has jurisdiction, independently of the statute, “ of all matrimonial and other causes of ecclesiastical cognizance,” and that it may grant a divorce for any of the causes enumerated by Lord Coke. It is hardly necessary to say that the reasoning is inapplicable to South Carolina. The powers of the Ecclesiastical Courts have never been conferred upon, have never been exercised by, the Court of Equity in this State. ■Our path is in a more humble and limited sphere. Whether wisely or unwisely, the Legislature has thought proper to withhold these powers. They have delegated to no Court the authority to declare a marriage null and void, and they have never themselves exercised the authority. Cases of individual hardship have occurred, and wdl occur ; but the observation of a different policy in other States, as well as the experience of our own, has served only to confirm the conviction that it is better to tolerate occasional suffering than to jeopardize the peace of society, and open a wide door to fraud, imposition and other immorality.
The motion is dismissed.
Johnston, Ch., Caldwell, Ch., and Richardson, J., ■O’Neall, J., Evans, J., Wardlaw, J., Withers, J. and Frost, J. concurred.

Motion dismissed.