**NORTHWESTERN NATIONAL INSURANCE COMPANY OF MILWAUKEE, WISCONSIN, Plaintiff–Appellant, Cross–Appellee,**

v.

**Jerry LUTZ, Defendant–Appellee, Cross–Appellant.**

**Nos. 95–1817, 95–1833.**

United States Court of Appeals, Seventh Circuit.

Argued Oct. 23, 1995.

Decided Dec. 5, 1995.

Rehearing Denied Jan. 3, 1996.

Richard C. Ninneman (argued), Mitchell S. Moser, Quarles & Brady, Milwaukee, WI, James T. Ferrini, Imelda Terrazino, Clausen, Miller, Gorman, Caffrey & Witous, Chicago, IL, for Northwestern National Insurance Company, Milwaukee, Wisconsin in No. 95–1817.

W. Mark Rasmussen (argued), Peoria, IL, for Lutz.

Richard C. Ninneman (argued), Mitchell S. Moser, Quarles & Brady, Milwaukee, WI, James T. Ferrini, Charles A. Gilmartin, Har-

vey R. Herman, Clausen, Miller, Gorman, Caffrey & Witous, Chicago, IL, for Northwestern National Insurance Company, Milwaukee, Wisconsin in No. 95–1833.

Before CUMMINGS, RIPPLE and MANION, Circuit Judges.

CUMMINGS, Circuit Judge.

In June 1985, defendant Jerry Lutz signed various documents relating to the purchase of units of Plantation Oaks, a Texas limited partnership. The documents were used by Plantation Oaks to obtain a loan from the European American Bank ("Bank"), and to persuade the plaintiff, Northwestern National Insurance Company of Milwaukee, Wisconsin ("Northwestern"), to issue a financial guarantee bond to the Bank. Thereafter Lutz made no payments to the Bank under his investor note, causing the Bank to make demands for payment by Northwestern. Northwestern made payments totalling $248,832, an amount corresponding to three units of the partnership. Northwestern subsequently sued Lutz for this amount. Following a one-day bench trial, the district court held that because Lutz's note had been altered Northwestern was entitled to judgment against Lutz for an amount corresponding to one unit of the partnership. Northwestern appeals and Lutz cross-appeals that judgment. For the following reasons, we **affirm.**

### BACKGROUND

Plantation Oaks is a Texas limited partnership created for the purpose of purchasing and operating an existing apartment complex in College Station, Texas.[1] To finance the purchase, Plantation Oaks sold units in the partnership to investors for $77,263 per unit. The investors obtained the units by executing an investor note payable to Plantation Oaks for $69,308 per unit and paying the balance in cash.

James Spolyar was one of four general partners of Plantation Oaks. On June 2, 1985, Spolyar and Lutz met at Lutz's home to discuss various business ventures, including Plantation Oaks. Spolyar testified that he informed Lutz that Plantation Oaks needed to sell between one and three units to close the deal, and that if Lutz purchased units Spolyar would buy him out of them within 120 days after the closing. [Tr. pp. 47–49]. Spolyar further testified that Lutz orally agreed to this arrangement.

On June 6, 1985, Lutz received from Spolyar various subscription documents relating to Plantation Oaks, including an investor note ("Note") and a document entitled "Estoppel Letter and Indemnity Agreement" ("Indemnity"). The Note recites that it evidences a portion of the purchase price of Lutz's subscription of units in the partnership and that it "is secured by a Surety Bond issued in favor of the Bank." The Indemnity is addressed to an unidentified bonding company, but provides that Lutz will "indemnify the Company and hold harmless against it all loss, liability, costs, claim, damages and expense, internal or external, of whatever kind and nature * * * caused by a default under the promissory note(s) of [Lutz]."

Lutz signed the Note and returned it to Spolyar. However, Lutz did not fill in a small blank space at the top of the Note indicating to the partnership the number of units subscribed for. Subsequently, someone in Spolyar's office inserted the number "3" in the blank space. Additionally, two substantial handwritten changes were made to the Note. First, the Note stated on its face that "[Lutz] unconditionally promises to pay to the order of Plantation Oaks * * * the principal sum of $69,308." However, someone in Spolyar's office inserted a handwritten caret, "∧", and the language "per unit" above the $69,308 figure. Second, the Note listed a payment schedule dictating four payments that totalled $69,308. Directly below this someone inserted the handwritten language "$69,308 × 3 units = $207,924." The initials "RAB" were added next to these insertions. We were informed by Northwestern's counsel at oral argument that the initials were presumably those of Richard A. Berish, an-

---

1. College Station, Texas is a small town in the southeast portion of Texas roughly 100 miles  from Austin.

other Plantation Oaks partner. The original Note revealed that Lutz's signature was in black ink, while the inserted information was in two different shades of blue ink.

At the loan closing in July 1985, Spolyar endorsed the investor notes, including Lutz's note, to the order of the Bank. The Bank accepted the notes and issued a loan to Plantation Oaks. As further security for the loan, Plantation Oaks provided the Bank with a financial guarantee bond issued by Northwestern in the amount of $2,772,320. The bond designated the Bank as the obligee and 24 limited partners in Plantation Oaks, including Lutz, as the individual principals. With respect to Lutz, his investor note was bonded for three partnership units, or $207,-924. There was no testimony or other evidence as to whether Northwestern saw the original Note or a copy thereof when it issued its bond.

Thereafter, Lutz made no payments to the Bank under the Note. The Bank made demands for payment by Northwestern under its bond, and Northwestern made six payments to the Bank totalling $248,832, an amount corresponding to three units. Northwestern filed suit against Lutz on April 4, 1988. In partially granting Northwestern's motion for summary judgment, the district court concluded:

> "[T]his court finds that there is no controversy on the question that [Lutz] did execute the Investment Note and Estoppel Letter and Indemnity Agreement and that both are enforceable against him. This Court also finds that due to an alleged alteration of the amount on the Investment Note, an issue of material fact remains as to the total for which [Lutz] must reimburse [Northwestern]. However, the minimum amount for which [Lutz] is liable is for one unit." [Order dated 3–17–92 p. 3–5].

Following a one-day bench trial, the district court concluded that the Note was "clearly altered," and that Lutz did not implicitly or explicitly authorize the alterations. Therefore, the district court found that Lutz was liable for one unit only and entered judgment for Northwestern for a corresponding amount. Northwestern appeals that judgment, and this Court has jurisdiction to hear that appeal pursuant to 28 U.S.C. § 1291.

## DISCUSSION

"Following a bench trial, we review the district court's factual determinations for clear error and its legal conclusions *de novo.*" *Market St. Assocs. Ltd. Partnership v. Frey,* 21 F.3d 782, 785 (7th Cir.1994). For the following reasons, we affirm the decision of the district court.

### 1. *UCC Claim*

■ Northwestern does not appeal the district court's factual finding that Lutz did not implicitly or explicitly authorize the alteration of the Note. Northwestern argues that this is "totally irrelevant," and that it is entitled to a judgment as a matter of law that Lutz is liable for an amount corresponding to three units, not one. Northwestern's first claim is that the district court erred in denying it full recovery as the Bank's subrogee under the Note. The financial guarantee bond issued to the Bank provides that to the extent Northwestern makes loss payments under the bond, it "shall be subrogated to all the [Bank's] rights against the [limited partners] and any other persons or organization liable under the terms of the defaulted Note." [Pl.App. 22]. As the Bank's subrogee, Northwestern stands in the same position as the Bank and can enforce the rights and claims that the Bank has against Lutz. *Dix Mut. Ins. Co. v. LaFramboise,* 149 Ill.2d 314, 173 Ill.Dec. 648, 650, 597 N.E.2d 622, 624 (1992).

■ Northwestern asserts that the Bank was a "holder in due course" and therefore may enforce the Note according to its altered terms pursuant to Section 3–407(3) of the Uniform Commercial Code ("UCC"), Ill.Rev. Stat. ch. 26, para. 3–407(3) (1985).[2] Section 3–302 of the UCC defines a "holder in due

2. Section 3–407(3) provides,
   "A subsequent holder in due course may in all cases enforce the instrument according to its original tenor, and when an incomplete instrument has been completed, he may enforce it as completed."

course" as a holder who takes the instrument:

(a) for value; and

(b) in good faith; and

(c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person.

We do not disagree with Northwestern's assertion that the Bank took the Note for value and in good faith. The question remains, however, whether the Bank had notice of a defense against the Note. Section 3–304(1)(a) states that a holder "has notice of a claim or defense if the instrument is so incomplete, bears such visible evidence of forgery or alteration, or is otherwise so irregular as to call into question its validity, terms or ownership or to create an ambiguity as to the party to pay."

The district court held that Lutz was not liable for three units because the Note was "clearly altered as evidenced by the different colors of ink used for the Defendant's signature and the placement of the alterations." Therefore, the district court concluded that the Bank had notice of a defense against the enforcement of the Note as altered, and was not a holder in due course. *Krilich v. Millikin Mortgage Co.*, 196 Ill.App.3d 554, 143 Ill.Dec. 487, 554 N.E.2d 422 (1st Dist.1990).

When Lutz signed the Note, it stated that Lutz "promise(s) . . . to pay . . . the principal sum of $69,308," which was for one unit. It also included a payment schedule dictating the dates of four payments totalling that amount. The only portion of the note not filled in by Lutz was a small blank space in the upper left hand corner of the Note indicating to the partnership the number of units to attribute to Lutz. After Lutz signed the Note, Berish added handwritten language—"^ per unit"—above the type-written sentence containing the $69,308 figure. Additionally, below the typed payment schedule dictating payments totalling $69,308, some-

one added handwritten language stating that the total was "$69,308 × 3 = $207,924." These various handwritten insertions were written in two shades of ink different from that of Lutz's signature.

Northwestern argues that UCC Section 3–304(4)(a) dictates that the Bank did not have notice of a defense. That section states that "[k]nowledge of the following facts does not of itself give the purchaser notice of a defense or claim . . . (4) that an incomplete instrument has been completed, unless the purchaser has notice of any improper completion." However, we do not agree that the Note was merely "completed." The insertion of the handwritten "per unit" language above the typewritten sentence stating that Lutz "promises to pay $69,308," as well as the handwritten language "$69,308 × 3 = $207,924," is not a "completion" of the Note. Thus Section 3–304(4)(a) simply does not apply.

We agree with the district court that the changes made to the Note were sufficient to put the Bank on notice that it had been altered. Therefore, the Bank was not a "holder in due course," and Section 3–407(3) is inapplicable.

■ Apparently dissatisfied with the district court's decision not to hold him liable for the full value of the Note as altered, Lutz asserts that he should be relieved of all liability. This is despite the fact that Lutz admitted in his sworn affidavit submitted to the district court that "it was [his] understanding that the principal amount of the purported liability was for one unit at $69,308" [Pl.App. 79]. In support of his assertion, Lutz relies on Section 3–407(2)(a) of the UCC, which provides that "[a]s against any person other than a subsequent holder in due course (a) alteration by the holder which is both fraudulent and material discharges any party whose contract is thereby changed unless that party assents or is precluded from asserting the defense."[3] Section 3–407(2)(b) provides that

---

**3.** Northwestern argues that Section 3–406 of the UCC precludes Lutz from asserting the alteration as a defense because Lutz was negligent in not completing the blank spaces at the upper left corner of the note. However, Section 3–406 states that "[a]ny person who by his negligence

substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority *against a holder in due course.*" Ill.Rev.Stat. ch. 26, para. 3–406 (emphasis added). The fact that the Bank

"[n]o other alteration discharges any party, and the instrument may be enforced according to its original tenor." Therefore, to be discharged from his obligation under Section 3–407, Lutz must prove that the alterations of the Note were "fraudulent and material."

Section 3–407(1) states that "[a]ny alteration of an instrument is material which changes the contract of any party thereto in any respect, including any such change in (c) the writing as signed, by adding to it or by removing any part of it." The alterations here significantly changed Lutz's obligation under the Note and were therefore "material." The question remains whether the alterations were "fraudulent."

No specific definition of "fraudulent" is included in the statute. However, the official comment to Section 3–407(2) provides some insight by stating that a material alteration does not discharge any party unless it is "made for a fraudulent purpose." The district court found that Lutz had not presented any evidence to indicate that the alterations were fraudulently made. Lutz asserts that this determination was clearly erroneous. Lutz cites *Hutcheson v. Herron*, 131 Ill. App.2d 409, 266 N.E.2d 449 (1st Dist.1970), in support of his assertion. In *Hutcheson*, the two instruments in question were changed by the holder from demand notes to notes payable one year and two years after the date of execution respectively. The maker of the notes argued that these alterations discharged his obligation pursuant to Section 3–407(2)(a). However, the court disagreed. The court cited the comment to Section 3–407, which provides that "the term 'fraudulent' probably requires a finding that the alteration has attempted to impose an obligation or obligations upon the maker or other party against whom enforcement is sought additional to his obligation on the instrument at the time he signed it." The court concluded that changing the instruments from de-

mand notes to notes payable did not increase the maker's obligation and therefore were not "fraudulent." Thus the maker's obligation was not discharged.

Lutz argues that *Hutcheson* should not only stand for the proposition that changes that do not increase a maker's obligation are not "fraudulent," but also should stand for the converse proposition: that changes that do increase a maker's obligation are *necessarily* "fraudulent." We do not believe that *Hutcheson* goes this far. *Hutcheson* merely requires that an alteration increase the obligation of the maker to be "fraudulent;" it does not preclude the necessity of finding fraudulent intent.[4]

■ Section 3–407 explicitly provides that for the signing party to be discharged, the alterations must be both "material" and "fraudulent." The comments to Section 3–407 state that no party is discharged unless the material alteration was "made with a fraudulent purpose." Therefore, to prove that an alteration was "fraudulent," a party must prove more than the mere fact that the alteration increased his obligation. See *First State Bank v. Keilman*, 851 S.W.2d 914, 921 (Tex.App.1993) (holding that defendants "were required to present evidence regarding fraudulent intent in order to be discharged from liability on the basis of the alteration" pursuant to Section 3–407). Because Lutz failed to present any evidence other than the alterations themselves, he has not proven that the alterations were "fraudulent," and is not discharged from his original obligation.

The Second Circuit recently affirmed a case where the district court reached a similar conclusion in an analogous situation. *Indemnity Ins. Co. v. American Deseret Ltd.*, 887 F.Supp. 521 (S.D.N.Y.1993), affirmed, 56 F.3d 460 (1995), involved a situation where investors had signed promissory notes to purchase units of a limited partnership. The

---

was not a holder in due course because of the alterations renders Section 3–406 inapplicable.

4. We are aware, however, that *Hutcheson* has been cited to stand for the proposition Lutz asserts. See *The Business Bank v. Plank*, 710 F.Supp. 619 (E.D.Va.1989). However, even though we feel the court in *Plank* misread

*Hutcheson*, that court stated that *Hutcheson*, as interpreted by that court, was the minority position in that it did not require the alteration to "involve some type of fraud, dishonesty or deceit to support a finding of 'fraudulent.'" *Plank*, 710 F.Supp. at 622 (quoting *Bank of Ripley v. Sadler*, 671 S.W.2d 454 (Tenn.1984)).

notes signed by the investors contained a specified price per unit, but left blank the amount of the investor's obligation under the note. The blanks were subsequently filled in at the closing with amounts corresponding to a certain number of units each investor purchased. The notes were then endorsed to a bank in exchange for a loan. After the investors defaulted, the plaintiff, a guarantor of the loan, paid the bank the amounts listed on the notes and sued each investor for the stated amount of his note. The investors claimed that the notes had been completed without authorization and were therefore invalid. The court held that the bank, and its subrogee, was a "holder in due course" and was therefore able to enforce the notes.

However, on the question of recovery the court did not necessarily grant the subrogee judgment against each defendant for an amount corresponding to the face value of his note. Instead, the court stated that "there was no evidence that any of these defendants knowingly obligated himself or itself for more than the value of one unit, [and] as to those defendants whose Notes reflect amounts exceeding the cost of one unit, recovery will be limited to the cost of one unit less amounts actually paid." *Id.* at 531.

We agree with the district court's conclusion here that Lutz should not be liable for three units because the Note was sufficiently altered to preclude the Bank from being a "holder in due course." However, because Lutz has not proven that the alteration was "fraudulent" for the purposes of Section 3–407(2) of the UCC, we conclude that Lutz's obligation is not discharged, and Northwestern may enforce the Note as originally executed for one unit.

### 2. *Indemnity Claim*

■ Northwestern next argues that the Indemnity entitles it to full recovery for three units, regardless of the alteration of the Note. Northwestern concedes that under surety law, where there is a surety agreement but no independent indemnification agreement, the law implies a promise on the part of the principal debtor to reimburse the surety for any amount it pays to the creditor, "*but only to the extent* of the debt for which the principal *debtor is liable* to the creditor" [Pl. Br. 23]. However, Northwestern argues that where the surety has the benefit of a separate indemnification agreement, the surety's recovery is not limited by this principle. In support of its position Northwestern cites *Commercial Ins. Co. of Newark v. Pacific–Peru Constr. Corp.*, 558 F.2d 948 (9th Cir.1977), where the Ninth Circuit stated that "resort to implied indemnity principles is improper when an express indemnification contract exists." *Id.* at 953.

■ We agree that the existence of a separate indemnification agreement dictates that the rights of the parties will be determined according to that document. Therefore, we look to the Indemnity to determine the extent of Lutz's liability. The Indemnity provides that Lutz "agrees ... to indemnify [Northwestern] and hold it harmless against all loss, ... of whatever kind or nature ..., caused by a default under the promissory note(s) of [Lutz]" [Pl.App. 33]. The district court found that the Note was executed for $69,308 and is enforceable for that amount. It would seem that this amount (plus interest and reasonable fees) would be the maximum amount of loss that could have been "caused by default" under the Note. Northwestern, however, argues that this is incorrect. It argues that the value of the underlying Note is irrelevant to the determination of Lutz's liability. Northwestern's position is simple: because Lutz defaulted by not paying anything on the Note, whatever its value, and because Northwestern paid the Bank's demand of $248,832, Lutz owes Northwestern that amount.

Northwestern points to the following district court cases within the jurisdiction of the Ninth Circuit in which the courts focused upon the above-quoted language to hold debtors liable to a surety despite the fact that the debtors claimed various defenses against the creditor. In *U.S. for Use of I.B.E.W. v. United Pac. Ins.*, 697 F.Supp. 378 (D.Idaho 1988), the court held that a debtor was liable under an indemnity agreement despite the fact that the debtor claimed that, although the validity of his signature on the indemnity agreement was not disputed, his signature on the underlying note was a for-

gery. In *Fireman's Fund Ins. Co. v. Nizdil*, 709 F.Supp. 975 (D.Ore.1989), the court held that a debtor was liable under an indemnity agreement despite the fact that the claim against the debtor may have been outside the scope of the underlying bond.[5]

The above cases are factually distinguishable from Lutz's situation in that they involved indemnification agreements containing language that was much broader than that in this Indemnity. In *Fireman's Fund*, "[t]he Indemnity Agreements demonstrate that plaintiffs have the right to be indemnified for any loss incurred by reason of posting the [guarantee] bonds." *Id.* at 977. In *U.S. for Use of I.B.E.W.*, "[t]he indemnitors agreed to indemnify and hold [surety] harmless from any loss ... incurred as a result of posting the [guarantee] bond". *Id.* at 380. The same is true of the only case cited by Northwestern involving Illinois law. In *Continental Cas. Co. v. Guterman*, 708 F.Supp. 953 (N.D.Ill.1989), the court held a debtor liable for the value of his note pursuant to a separate indemnity agreement despite the debtor's assertion that the surety had failed to assert the debtor's equitable defenses against the creditor. However, the court based its finding on the fact that the indemnity agreement in question "expressly provides for indemnification by [debtor] regardless of whether [surety] asserts his equitable claims." *Id.* at 954; see also *Lamp, Inc. v. International Fidelity Ins. Co.*, 143 Ill. App.3d 692, 97 Ill.Dec. 664, 666, 493 N.E.2d 146, 148 (2d Dist.1986) (indemnity agreement provided for indemnification of all losses sustained by surety "by reason of having executed or procured the execution of the [guarantee] bonds"). Northwestern itself was recently granted a summary judgment in *Northwestern Nat. Ins. Co. of Milwaukee v. Alberts*, 822 F.Supp. 1079 (S.D.N.Y.1993), regarding an indemnification agreement that provided for payment of losses Northwestern "sustained by reason of issuing said Financial Guarantee Bond." *Id.* at 1081.

The only case cited by Northwestern involving an indemnification agreement with language similar to that of the Indemnity is *Insurance Co. of N.A. v. Bath*, 726 F.Supp. 1247 (D.Wyo.1989). In that case, the court held that a debtor was liable under a separate indemnity agreement despite the fact that the debtors had informed the surety that they had stopped paying on the note because of a fraud allegedly undertaken by the underlying partnership, but one for which the debtor had taken no action. But this case is also distinguishable in that while the court did allow the surety to collect from the debtor, the amount of the debtor's liability was not greater than the amount of the underlying bond.

Because the Indemnity provided that Lutz would indemnify Northwestern for losses "caused by default" under the Note, Northwestern's recovery is limited to the value of the Note. The Note was executed by Lutz for $69,308. Therefore, Northwestern's recovery was properly limited by the district court to that amount plus interest and reasonable fees.

## 3. Estoppel Claim

■ Finally, Northwestern argues that Lutz is liable for three units because he is estopped on equitable principles since his "conduct of signing blank documents constituted misrepresentations that he in fact was a limited partner in Plantation Oaks" [Pl. Br. 36]. This argument is flawed in that Northwestern fails to recognize that Lutz's signing the Note was not a representation that he was a limited partner in the amount of three units. The Note, prior to alteration, was only a document evidencing that Lutz intended to purchase one unit of the partnership. If the partnership chose to accept his Note in return for a unit of the partnership, which is apparently what occurred, then he was a limited partner in that amount. We fail to see how Lutz represented to anyone that he

5. Northwestern also cites *English v. Century Indem. Co.*, 342 S.W.2d 366 (Tex.Civ.App.1961), for the same proposition. However, this case was recently explained in *Tubbs v. Bartlett*, 862 S.W.2d 740 (Tex.Civ.App.1993), to "stand for the proposition that if an indemnitee knew or should have known that the contract for the performance of which indemnification was obtained was illegal and therefore void, then the performance bond and the indemnity agreement are likewise void." *Id.* at 751. Thus *English* has no application here.

was a limited partner in the amount of three units.

Northwestern points to evidence introduced at trial indicating that Lutz intended to sell his partnership unit within 120 days as support for its estoppel claim. But there is no evidence of any partnership restrictions on the sale of Lutz's interest and no evidence that such a sale would violate any provision of the Note or the Indemnity. As such, the documents clearly provide that Lutz was free to sell his unit of the partnership at any time. Northwestern's estoppel argument is without merit.

### 4. Fees

Northwestern asserts that the district court erred in its determination of Northwestern's award of attorney's fees. Northwestern made a submission requesting fees totalling $133,338.50 and costs totalling $8,027.51. The district court allowed the $8,027.51 in costs, but reduced the fee request by two-thirds and allowed $44,462.78. The district court stated,

> "The court finds the hourly rate of Plaintiff's attorneys to be reasonable, but Plaintiff's counsel was only one third successful. In addition, counsel failed to immediately bring to the Court's attention the different colors of ink used on the Investor Note. The Court notes that if all concerned had focussed in on this discrepancy earlier, the amount of hours spent on this case may have been significantly reduced."

Northwestern has not convinced us that this determination was clearly erroneous.

### CONCLUSION

For the foregoing reasons, we agree with the district court's judgment that Lutz is liable to Northwestern under the UCC and the Indemnity for an amount corresponding to one unit of the partnership. Therefore, the judgment of the district court is affirmed.