In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 18-2144 & 18-3446

FIDELITY AND DEPOSIT COMPANY OF MARYLAND,

*Plaintiff-Appellant*,

*v.*

EDWARD E. GILLEN COMPANY,

*Defendant-Appellee*.

Appeals from the United States District Court for the
Eastern District of Wisconsin.
No. 13-C-1291 — **Lynn Adelman**, *Judge*.

ARGUED APRIL 1, 2019 — DECIDED JUNE 3, 2019

Before EASTERBROOK, SYKES, and BRENNAN, *Circuit Judges*.

BRENNAN, *Circuit Judge*. Although linguists call Latin a "dead language," legal nomenclature dies hard. This case presents a surety's claim for *quia timet*—equitable protection from probable future harm. The surety (an insurance company) is suing its principal (a construction company) that allegedly went belly up on a government project. The ancient equitable doctrine of *quia timet* remains viable into the 21st century, but the surety's claim in this case is a dead letter.

## I. Background

The relevant facts are straightforward and undisputed. About ten years ago, the Public Building Commission of Chicago awarded a harbor construction contract to a joint venture formed by Edward E. Gillen Company ("Gillen") and two other entities. The joint venture subcontracted some of the work to Gillen, which in turn subcontracted with various other companies for labor and materials.

To secure its work, the joint venture obtained over $30 million in performance and payment bonds[1] issued by Fidelity and Deposit Company of Maryland ("Fidelity"). Fidelity received in return (in addition to its premium) an indemnity agreement and a net worth retention agreement, both executed by Gillen. The indemnity agreement obligated Gillen to "exonerate, indemnify, and keep indemnified" Fidelity for all losses and expenses incurred on the bonds. In the net worth retention agreement, Gillen promised to maintain a net worth greater than $7.5 million.

During 2012, over a dozen subcontractors sued Gillen in Illinois state court, alleging Gillen failed to pay for labor and materials used on the harbor project. Those plaintiffs named Fidelity as a co-defendant based on its payment bond

---

[1] Aptly named, a performance bond on a construction project is a surety's guarantee that the principal's work will be completed. A payment bond guarantees the principal will pay its laborers, subcontractors, and suppliers. PETER A. ALCES, THE LAW OF SURETYSHIP AND GUARANTY §§ 10.2–10.3 (2018 ed.); *see also* Marilyn Klinger, et al., *Contract Performance Bonds, in* THE LAW OF SURETYSHIP 81, 81–83 (Edward G. Gallagher ed., 2d ed. 2000); Kelly Allbritton Katzman, *Purpose of The Payment Bond and Who and What Is Covered, in* THE LAW OF SURETYSHIP 147, 147–48 (Edward G. Gallagher ed., 2d ed. 2000).

obligations. Eleven of the lawsuits have been resolved over the years; six remain pending.

Fidelity then sued Gillen in federal court, alleging five claims: breach of the indemnity agreement (Count I); a request for an accounting of contract payments under the indemnity agreement (Count II); breach of the net worth retention agreement (Count III); *quia timet* (Count IV); and a demand for access to books and records (Count V). On its *quia timet* claim, Fidelity sought $2.5 million in cash from Gillen as bond collateral and an order requiring Gillen to satisfy all bond obligations and prohibiting Gillen from disbursing money without court approval. Gillen counterclaimed.

After several years of slow-moving litigation, the district court (with both sides' agreement) referred the case to a magistrate judge for mediation. The parties settled all claims at the mediation, except for Fidelity's *quia timet* claim. They agreed their settlement would not impact the *quia timet* claim (or Gillen's defenses) in any manner.

With only *quia timet* remaining, Gillen filed a motion for summary judgment, which the district court granted. Gillen then submitted a bill of costs that the clerk of court eventually taxed against Fidelity. Fidelity filed a separate notice of appeal challenging each order.

## II. Discussion

### A.  The Doctrine of Quia Timet

To start, the doctrine is pronounced "kwee-ə tim-et" and translates from Latin as "because he fears." *Quia timet*, BLACK'S LAW DICTIONARY (10th ed. 2014). Centuries ago,

English courts of equity modeled bills[2] *quia timet* on even-more-ancient common law writs known as *brevia anticipantia*—unique relief available before the plaintiff sustained an injury. 2 EDWARD COKE, THE FIRST PART OF THE INSTITUTES OF THE LAWES OF ENGLAND 100a (London, Stationers' Co. 1628); *see also* 2 JOSEPH STORY, COMMENTARIES ON EQUITY JURISPRUDENCE § 825 (Boston, Hilliard, Gray, & Co. 1836); GEORGE TUCKER BISPHAM, THE PRINCIPLES OF EQUITY § 568 (Philadelphia, Kay & Bro. 1874).

Justice Story described such bills as "in the nature of writs of prevention to accomplish the ends of precautionary justice[,] … applied to prevent wrongs or anticipated mischiefs, and not merely to redress them when done." STORY, *supra*, § 826. Historically, litigants have used bills *quia timet* to pursue preemptive relief regarding myriad issues, such as remainder interests in real estate,[3] disputes over wills,[4] the appointment of a receiver,[5] and the annulment of marriages.[6] *See* STORY, *supra*, §§ 827–851; BISPHAM, *supra*, §§ 569–81; *see also* Jay M. Mann, *Exoneration and* Quia Timet, *in* THE LAW OF SURETYSHIP 455, 457 (Edward G. Gallagher ed., 2d ed. 2000).

Application of the doctrine to surety relationships is similarly longstanding. *See*, *e.g.*, *Nisbet v. Smith* (1789) 29 Eng. Rep. 317, 319; 2 Bro. C. C. 579 (Lord Thurlow LC) ("It is clear and

---

[2] Equity pleading's version of a civil complaint.

[3] *See*, *e.g.*, *Criswell v. Criswell*, 163 N.W. 302 (Neb. 1917); *Champlin v. Champlin*, 4 Edw. Ch. 228 (N.Y. Ch. 1843).

[4] *See*, *e.g.*, *Bryant v. Peters*, 3 Ala. 160 (1841).

[5] *See*, *e.g.*, *Dougherty v. McDougald*, 10 Ga. 121 (1851).

[6] *See*, *e.g.*, *Mattison v. Mattison*, 20 S.C. Eq. 387 (1847).

never has been disputed … that a surety, generally speaking, may come into this Court, and apply for the purpose of compelling the principal debtor for whom he is surety to pay in the money, and deliver him from the obligation."); *Ranelaugh v. Hayes* (1683) 23 Eng. Rep. 405, 406; 1 Vern. 190 (Lord Keeper) (noting a surety may use *quia timet* to require a principal to discharge a debt, "it being unreasonable that a man should always have such a cloud hang over him").[7]

A surety's equitable right to *quia timet* relief is closely related to its right to exoneration, and the two concepts are often muddled.[8] Jay M. Mann & Curtis A. Jennings, Quia Timet: *A Remedy for the Fearful Surety*, 20 FORUM 685, 687 (1984); *see also* Walter W. Downs, Quia Timet *as a Preventer of Anticipated Mischief*, 1956 ABA SEC. INS. NEGL. & COMP. L. PROC. 173, 174-75 (1956) ("[Q]*uia timet* has from ancient times been considered as a separate remedy applicable where exoneration is not appropriate."). Exoneration is the surety's "right to enforce the principal's duty to perform when the underlying obligation is due." PETER A. ALCES, THE LAW OF SURETYSHIP AND GUARANTEE § 6:12 (2018 ed.). When the person to whom performance is owed comes to the surety to collect, the surety

---

[7] *See also* 18 CHARLES VINER, GENERAL ABRIDGMENT OF LAW AND EQUITY 141–42 (Hampshire, Aldershot 1744); STORY, *supra*, § 849; JOHN WILLARD, A TREATISE ON EQUITY JURISPRUDENCE 331 (New York, Banks & Bros. 1863); 1 WILLIAM WAIT, GENERAL PRINCIPLES OF THE LAW 656–57 (Albany, William Gould, Jr. & Co. 1885); *cf. Escrow Agents' Fidelity Corp. v. Superior Court*, 4 Cal. App. 4th 491, 495 (1992) ("Quia timet is in fact especially suited to surety cases.").

[8] Count IV of Fidelity's operative complaint is labeled "*QUIA TIMET* AND EXONERATION." But Fidelity is no longer pursuing an exoneration claim, focusing solely on *quia timet* relief.

may use exoneration to force its principal to perform (thus re-leasing the surety from its secondary obligation). *See Admiral Oriental Line v. United States*, 86 F.2d 201, 204 (2d Cir. 1936) (Hand, J.) ("[B]efore paying the debt a surety may call upon the principal to exonerate him by discharging it; he is not obliged to make inroads into his own resources when the loss must in the end fall upon the principal."). But "before the un-derlying obligation is due," a surety may use *quia timet* "to demand that the principal obligor provide adequate assur-ance of the principal's performance." ALCES, *supra*, § 6:12; *see also Borey v. Nat'l Union Fire Ins. Co.*, 934 F.2d 30, 32 (2d Cir. 1991) (explaining the temporal distinction between a surety's *quia timet* and exoneration rights).

Given the versatility of bills *quia timet* and their breadth of applications, the remedies available are correspondingly var-ied. STORY, *supra*, § 826 (explaining chancellors could adapt "their relief to the precise nature of the particular case, and the remedial justice required by it"); *see also* RESTATEMENT (THIRD) OF SURETYSHIP & GUARANTY § 21 cmt. k (Mar. 2019 supp.) ("The relief granted, when exoneration or *quia timet* rights are asserted, depends on the facts of the particular case."). Courts may appoint receivers, enjoin actions, order a defendant to pay money into the court, or otherwise provide security to the plaintiff. 1 WAIT, *supra* at n.7, at 657–61. Injunc-tive relief is only one option available to a court of equity con-sidering a bill *quia timet*. BISPHAM, *supra*, § 568; *see also Borey*, 934 F.2d at 33 (distinguishing between preliminary injunc-tions and *quia timet* as a "final remedy").

With the lack of formal causes of action in courts of equity, *see* CHARLES HERMAN KINNANE, FIRST BOOK ON ANGLO-AMERICAN LAW § 220 (2d ed. 1952), the term *quia timet* (as used

in the context of suretyship) took on a dual meaning. Courts and commentators have used the term to refer to the surety's common law right to assurance of the principal's future performance and also to the various equitable remedies available in such scenarios. *See, e.g., Borey*, 934 F.2d at 32 (describing *quia timet* as the surety's "right" to demand security from its principal and also as a "procedural device"); Walter W. Downs, Quia Timet *as a Preventer of Anticipated Mischief*, 1956 ABA SEC. INS. NEGL. & COMP. L. PROC. 173, 173 (1956) ("What is *quia timet*? Is it a principle of equity or is it a form of relief?"); JOHN NORTON POMEROY, A TREATISE ON EQUITY JURISPRUDENCE §§ 1393, 1394 (Spencer W. Symons ed., 5th ed. 1941) (describing "bills *quia timet*" as remedies for declaring or establishing another legal or equitable right).

### B. *A Principal's Insolvency and* Quia Timet *Relief*

Returning to the case at hand, Fidelity's *quia timet* claim seeks $2.5 million in cash collateral from Gillen, as well as an order requiring Gillen to satisfy bond claims. The district court awarded Gillen summary judgment, ruling *quia timet* relief was unavailable due to Gillen's alleged insolvency. The district court, in effect, applied a Catch-22: Fidelity's basis for *quia timet* relief is Gillen's alleged insolvency; Gillen is unable to provide security to Fidelity if it is insolvent; but if Gillen is not insolvent, then there is no basis for *quia timet* relief. Decision and Order 4, *Fidelity & Deposit Co. v. Edward E. Gillen Co.*, No. 13-C-1291 (E.D. Wis. Apr. 23, 2018), ECF No. 158.

Contrary to the district court's ruling, insolvency does not preclude *quia timet* relief. A principal's insolvency may often serve as a reasonable basis for a surety to fear the principal's nonperformance or nonpayment and seek court intervention. *See, e.g., Western Cas. & Surety Co. v. Biggs*, 217 F.2d 163, 164

(7th Cir. 1954) (affirming *quia timet* relief awarded to surety based on general contractors' insolvency); *Morley Constr. Co. v. Maryland Cas. Co.*, 90 F.2d 976, 977 (8th Cir. 1937) (similar); *contra Fireman's Fund Ins. Co. v. S.E.K. Constr. Co.*, 436 F.2d 1345, 1349 (10th Cir. 1971) (citing the fact that the principal was solvent as a factor weighing against *quia timet* relief).[9]

The district court's ruling relied on *Escrow Agents' Fid. Corp. v. Superior Court*, 4 Cal. App. 4th 491 (1992), but that case does not stand for the proposition that a principal must be solvent for *quia timet* relief to be appropriate. The California Court of Appeal explained that one use of a *quia timet* action is to prevent a solvent principal from wasting or diverting assets. *Id.* at 496. But the opinion never disclaims other applications of the doctrine nor does it purport to make proof of the principal's solvency a required element of the surety's claim.

The district court's summary judgment decision also rested on the incorrect premise that a defendant's inability to comply with a judgment defeats the plaintiff's claim. That is not a valid defense. Many civil defendants are insolvent; that

---

[9] *See also Miller v. Speed*, 56 Tenn. 196, 201 (1872) ("Where the principal debtor is insolvent, his surety may proceed against him before paying the debt, for indemnity or to subject particular assets to the payment of the debt."); *Crawford v. McAdams*, 63 N.C. 67, 69 (1868) ("So, if a surety fears that by the delay of a creditor the principal may become insolvent, he has election either to discharge the debt, and sue his principal for 'money paid,' or to file a bill '*quia timet*.'"); 74 AM. JUR. 2d *Suretyship* § 125 (Feb. 2019 supp.) ("Where a principal is known to be insolvent, after the debt has become due, the surety has an immediate right to sue to compel the principal to pay so that the surety's position is not further harmed."); Downs, *supra*, at 184 (describing the principal's insolvency as an "obvious example" of a circumstance justifying *quia timet* relief).

does not render a judgment against them pointless or moot. A judgment against a thriving defendant with deep pockets may be more valuable than one against a bankrupt firm, but both have legal significance. Whether Gillen can provide Fidelity with cash collateral if a court order requires Gillen to do so does not impact whether Fidelity is entitled to such collateral as a matter of law. The summary judgment grant to Gillen cannot be upheld on these rationales.

## C. Gillen's Alternative Argument for Affirmance

We may affirm a judgment on any ground supported by the record, so long as the issue was adequately raised in the district court and the opposing party had an opportunity to contest it. *O'Brien v. Caterpillar Inc.*, 900 F.3d 923, 928 (7th Cir. 2018); *see also United States v. Am. Ry. Express Co.*, 265 U.S. 425, 435 (1924) (Brandeis, J.) ("[T]he appellee may, without taking a cross-appeal, urge in support of a decree any matter appearing in the record, although his argument may involve an attack upon the reasoning of the lower court or an insistence upon matter overlooked or ignored by it."). Although the district court did not address the question, Gillen contends Fidelity "released" its equitable rights in settlement.

Recall that the two sides resolved their respective claims at mediation, except for Fidelity's equitable *quia timet* claim. Although the settlement agreement is not crystal clear, Fidelity did not release its *quia timet* claim, as Gillen contends. Fidelity instead used a belt-and-suspenders approach to reinforce its refusal to release Count IV. Section 7 of the settlement agreement states the *quia timet* claim "shall remain pending and is not affected by this Agreement," and Section 9 reads, "The parties intend that this release shall have no effect whatsoever upon Count IV and any affirmative defenses and

counterclaim alleged with respect to said Count IV." Settlement Agreement and Release ¶¶ 7, 9, *Fidelity & Deposit Co. v. Edward E. Gillen Co.*, No. 2:13-cv-01291-LA (E.D. Wis. Sept. 22, 2017), ECF No. 139-1. The text of the settlement agreement shows Fidelity did not release its equitable *quia timet* claim.

But Gillen's substantive argument is that Fidelity cannot use an equitable doctrine to supplement its contractual rights. The issue is not whether Fidelity released its *quia timet* claim, but whether it could pursue such a claim in the first place.

In the modern world, financial institutions do not issue multi-million-dollar bonds based on an oral promise and a handshake. Notwithstanding their common law equitable rights, sophisticated sureties take care to draft written indemnity agreements, detailing the respective obligations between the surety and the principal. Armen Shahinian, *The General Agreement of Indemnity*, *in* THE LAW OF SURETYSHIP 487 (Edward G. Gallagher ed., 2d ed. 2000); *see also* RESTATEMENT (THIRD) OF SURETYSHIP & GUARANTY § 6 cmt. a (Mar. 2019 supp.) ("Agreements … that set out the duties of the principal obligor to the secondary obligor are often referred to as indemnity agreements, and are customary in many business contexts."). Fidelity is no exception. Before issuing the bonds, it required Gillen to sign a detailed indemnity agreement, which included an express indemnification provision, a 584-word collateralization provision (remarkably, all one sentence), and a contingent trust. Fidelity also had Gillen and its owners execute a net worth retention agreement, promising that Gillen would maintain a net worth greater than $7.5 million. Fidelity brought breach of contract claims seeking relief under these contractual provisions. Did Fidelity also have additional rights under the equitable doctrine of *quia timet*?

That question raises an antecedent one: What jurisdiction's law governs? Here, diversity of citizenship provides federal subject matter jurisdiction, 28 U.S.C. § 1332(a)(1), which ordinarily means we employ the choice-of-law rules of the state in which the district court sits. *NewSpin Sports, LLC v. Arrow Elec., Inc.*, 910 F.3d 293, 300 (7th Cir. 2018). Fidelity argues Illinois substantive law applies. Although Gillen discusses Wisconsin law in its brief, it offers no justification for that choice of law.

Wisconsin's choice-of-law rules, adopted in 1967 from the work of Professor Robert A. Leflar, *see Heath v. Zellmer*, 151 N.W.2d 664, 672 (Wis. 1967) (citing Robert A. Leflar, *Choice-Influencing Considerations in Conflicts Law*, 31 N.Y.U. L. Rev. 267 (1966)), look to five factors: (1) predictability of results; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interests; and (5) application of the better rule of law. *Drinkwater v. Am. Family Mut. Ins. Co.*, 714 N.W.2d 568, 576 & n.4 (Wis. 2006).[10] This dispute arises out of a construction project in Illinois, funded by an arm of Illinois state

---

[10] Wisconsin continues to formally distinguish between contract and tort actions for purposes of conflict-of-law analysis. *See State Farm Mut. Auto. Ins. Co. v. Gillette*, 641 N.W.2d 662, 670–71, 676 (Wis. 2002) (applying the "most significant relationship" rule for contract issues and Professor Leflar's five factors for tort issues). As a request for common law equitable relief, Fidelity's *quia timet* claim does not fit neatly into either category. But the two tests overlap significantly, as the jurisdiction favored by Professor Leflar's five factors can usually be said to have the "most significant relationship" with the case. Because the Wisconsin Supreme Court in *Drinkwater* applied Professor Leflar's five factors after focusing on "the centrality of the equitable nature of subrogation," 714 N.W.2d at 650, we apply that same test to the equitable claim in this case.

government, which led to the lawsuits in Illinois state court
that form the basis for Fidelity's claim. Wisconsin's only con-
nection to this case is that Gillen is a Wisconsin company. The
predictability and maintenance of interstate order factors
weigh heavily in favor of applying Illinois law. The parties
agree that Illinois's law on *quia timet* is more developed than
that of Wisconsin, so the third and fifth factors also favor Illi-
nois law. And Wisconsin has no apparent governmental in-
terest in construction bond litigation arising out of an Illinois
project. So Wisconsin's choice-of-law rules direct us to apply
Illinois law.

The more intriguing choice-of-law issue—not raised by
the litigants—is whether we must apply state law, or if federal
common law controls. After *Erie R.R. Co. v. Tompkins*, 304 U.S.
64 (1938), the scope of federal common law is exceedingly nar-
row. *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630,
641 (1981) (explaining that, absent congressional authoriza-
tion, "federal common law exists only in … narrow areas,"
such as conflicts between States and admiralty cases); *see also*
*Todd v. Societe Bic, S.A.*, 21 F.3d 1402, 1414 (7th Cir. 1994)
("When this court sits in diversity, federalism requires us to
enforce the substantive law of the forum state, even when we
conclude we see a more enlightened path."). But post-*Erie*
Supreme Court precedent suggests federal courts' equitable
powers are limited, not by state law, but to the traditional
powers exercised by English courts of equity, even in

diversity cases. *Guaranty Tr. Co. v. York*, 326 U.S. 99, 105–07 (1945).[11] The Supreme Court has held (albeit before *Erie*) that *quia timet* relief in federal court is a matter of federal common law. *McConihay v. Wright*, 121 U.S. 201, 206 (1887) ("Bills *quia timet* … belong to the ancient jurisdiction in equity, and no change in state legislation … can, of itself, curtail the jurisdiction in equity of the courts of the United States.").

Yet solving this thorny choice-of-law problem ultimately is not necessary to resolve this case. Fidelity does not have a *quia timet* claim under either Illinois or federal law. Neither permits a surety to use general equitable principles to obtain rights beyond those for which it negotiated in a written indemnity agreement.

Take Illinois law first: as a general rule, an indemnity agreement renders unavailable common law theories of "implied indemnity." *Quilico v. Union Oil Co.*, 374 N.E.2d 219, 226 (Ill. App. Ct. 1978); *see also Carroll v. Acme-Cleveland Corp.*, 955 F.2d 1107, 1113 (7th Cir. 1992) (applying *Quilico* rule). The existence of the indemnity agreement "precludes inquiry into

---

[11] *See also Davilla v. Enable Midstream Partners*, 913 F.3d 959, 973 (10th Cir. 2019) ("[T]he practice of borrowing state rules of decision does not apply with equal force to determining appropriate remedies, especially equitable remedies, as it does to defining actionable rights."); *Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 646 F.2d 800, 806 (2d Cir. 1981) ("State law does not govern the scope of the equity powers of the federal court; and this is so even when state law supplies the rule of decision."); *Clark Equip. Co. v. Armstrong Equip. Co.*, 431 F.2d 54, 57 (5th Cir. 1970) (holding federal courts have "the power to enforce State-created substantive rights by well-recognized equitable remedies even though such remedy might not be available in the courts of the State"); 19 CHARLES A. WRIGHT, ET AL., FEDERAL PRACTICE & PROCEDURE § 4513 (3d ed. 2018 supp.) (detailing the history of the "equitable-remedial-rights doctrine").

potential rights and liabilities under implied indemnity and a recovery by the indemnitee, if any, must stem from the contract." *Prater v. Luhr Bros., Inc.*, 366 N.E.2d 399, 404 (Ill. App. Ct. 1977). We see no reason to think Illinois courts would deviate from that approach for contractual collateralization rights and prospective relief like *quia timet*. *Cf. Mountbatten Surety Co. v. Szabo Contracting, Inc.*, 812 N.E.2d 90, 100–01 (Ill. App. Ct. 2004) (analyzing surety's indemnity and collateralization rights based on terms of contract, without resort to general equitable principles); *Travelers Cas. & Surety Co. v. Bowman*, 893 N.E.2d 583, 591 (Ill. 2008) (distinguishing between express and implied indemnification for statute of limitation purposes). The parties' indemnity agreement provided mechanisms for Fidelity to demand bond collateral, indemnification by Gillen, and the imposition of a trust over contract payments received by Gillen. Fidelity sued on those contractual rights, but it settled those claims at mediation. Illinois law does not afford Gillen additional common law rights based on general equitable principles.

Likewise, federal courts (including ours) have declined to use their equitable powers to supplement a surety's rights under a written contract. *See, e.g., Northwestern Nat'l Ins. Co. v. Lutz*, 71 F.3d 671, 677 (7th Cir. 1995) ("We agree that the existence of a separate indemnification agreement dictates that the rights of the parties will be determined according to that document."); *Commercial Ins. Co. v. Pacific-Peru Constr. Corp.*, 558 F.2d 948, 953 (9th Cir. 1977) ("[R]esort to implied indemnity principles is improper when an express indemnification

contract exists.").[12] Fidelity is aware of that. *Fidelity & Deposit Co. v. Bristol Steel & Iron Works, Inc.*, 722 F.2d 1160, 1163 (4th Cir. 1983) (holding Fidelity's indemnification and exoneration rights were determined by the "letter of [its] contract" rather than "general 'indemnity principles'").[13]

After negotiating for specific collateralization and indemnification rights, suing on that indemnity agreement, and then settling its breach of contract claims, Fidelity cannot now use this ancient equitable doctrine to get additional relief. Gillen is entitled to summary judgment. As per another Latin maxim: *Aequitas non supplet ea quae in manu orantis esse possunt* ("Equity does not provide for those things that may be in the hand of an applicant."). *Legal Maxims*, BLACK'S LAW DICTIONARY app. b at 1901 (10th ed. 2014).

---

[12] *See also* 72 C.J.S. *Principal and Surety* § 248 (Mar. 2019 supp.) ("Where there is an express indemnification agreement, resort to implied indemnity principles ordinarily will be precluded. Moreover, when there is an express contract for indemnity, the rights of the surety are not to be determined by general indemnity principles, but by the letter of the contract for indemnity."); 74 AM. JUR. 2d *Suretyship* § 122 (Feb. 2019 supp.) ("When there is an express contract for indemnity, the rights of the surety are not to be determined by general indemnity principles but by the letter of the contract for indemnity, and a court will apply the ordinary rules of contract construction.").

[13] Fidelity points to one district court opinion that permitted both a breach of contract claim and an equitable *quia timet* claim to survive a motion to dismiss. Appellant's Reply at 19 (citing *Hanover Ins. Grp. v. Singles Roofing Co.*, No. 10 C 611, 2012 WL 2368328 (N.D. Ill. June 21, 2012)). Nowhere does that opinion discuss this issue, as it appears the defendant did not raise it as a basis for dismissing the *quia timet* claim.

### D. The Costs Order

In addition to its merits appeal, Fidelity also challenges the costs taxed by the clerk of court. Fidelity argues numerous items claimed as costs by Gillen are not covered by the applicable statute, 28 U.S.C. § 1920. But Fidelity's arguments are not properly before this court.

After the district court's summary judgment decision, Gillen filed a bill of costs under FED. R. CIV. P. 54(d)(1), which specifies: "The clerk may tax costs on 14 days' notice. On motion served within the next 7 days, the court may review the clerk's action." The district court's local rules flesh out the applicable procedure before the clerk of court, directing a party opposing costs to serve objections within 14 days and giving each side 7 days to file their response and reply briefs. E.D. WIS. CIV. R. 54(a)(3). The local rules also explain how a party may challenge the clerk's order taxing costs: "A party may move for review of the Clerk of Court's decision taxing costs pursuant to Fed. R. Civ. P. 54(d) within 7 days from taxation." E.D. WIS. CIV. R. 54(c).

Fidelity objected to Gillen's bill of costs with the clerk of court. But after the clerk taxed costs in Gillen's favor, Fidelity did not move for district court review; it simply filed a notice of appeal to this court.

An objecting party is not permitted to bypass the district court and seek immediate review of a clerk's costs order in the court of appeals. *See Cooper v. Eagle River Mem. Hosp.*, 270 F.3d 456, 464 (7th Cir. 2001); 10 CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE & PROCEDURE § 2679 (4th ed. Nov. 2018 supp.) ("[A] party's failure to seek review of a clerk's costs order in the district court constitutes a waiver of the right to

challenge that order on appeal.").[14] Both FED. R. CIV. P. 54(d) and E.D. WIS. CIV. R. 54(c) direct a party dissatisfied with a clerk's costs order to file a motion for review by the district court. Fidelity failed to heed those directives and, thereby, forfeited its objections. Although Gillen does not point out Fidelity's forfeiture in its brief, we may raise it ourselves. *Lauth v. Covance, Inc.*, 863 F.3d 708, 718 (7th Cir. 2017).

We cannot look past Fidelity's procedural misstep. Fidelity relies on 28 U.S.C. § 1291 for appellate jurisdiction, which provides, "The courts of appeals … shall have jurisdiction of appeals from all final decisions of the district courts of the United States … ." But there has been no final decision on costs made by the district court, only an order entered by the clerk of court. *See Johnson v. United States*, 780 F.2d 902, 910 (11th Cir. 1986) (holding the court of appeals lacked jurisdiction to consider objections to clerk's order taxing costs because the district court had not yet ruled on such objections). Without a final decision by the district court, we lack jurisdiction to rule on Fidelity's objections to the costs taxed against it.

### III. Conclusion

Fidelity negotiated for specific indemnification and collateralization rights in its written agreements, sued on those rights, and settled its breach of contract claims. It may not augment its contractual rights now with the ancient equitable doctrine of *quia timet*.

---

[14] *See also Ahlberg v. Chrysler Corp.*, 481 F.3d 630, 638–39 (8th Cir. 2007); *Bloomer v. United Parcel Serv., Inc.*, 337 F.3d 1220, 1221 (10th Cir. 2003) (per curiam); *Walker v. California*, 200 F.3d 624, 625–26 (9th Cir. 1999) (per curiam); *Prince v. Poulos*, 876 F.2d 30, 34 (5th Cir. 1989).

For these reasons, we AFFIRM summary judgment for Gillen on the merits and DISMISS Fidelity's challenge to the costs taxed by the clerk of court.